UNITED STATES of America

v.

Tremell W. WILLIAMS.

UNITED STATES of America

v.

Shelby COOMES.

UNITED STATES of America

v.

Christopher GWIN and Paul Gwin.

UNITED STATES of America

v.

Brian K. THOMPSON.

UNITED STATES of America

v.

Edwina Gail MANNING, James Edward Bright and Gerald Tharpe.

UNITED STATES of America

v.

Christopher Dale CLAY.

Nos. 3–88–00014, 3–88–00036, 3–88–00003, 3–88–00038, 3–87–00169 and 3–87–00160.

United States District Court, M.D. Tennessee, Nashville Division.

June 23, 1988.

Joe B. Brown, U.S. Atty., Gregory C. Sisk, Dept. of Justice, Washington, D.C., William T. Warren, William M. Cohen, Peter J. Strianse and Jimmie Lynn Ramsaur, Asst. U.S. Attys., for U.S.

William P. Redick, Jr., Don Dawson, Mariah Wooten, Asst. Federal Public Defenders, E.E. Edwards, III, Thomas W. Watson, William B. Bruce, Nashville, Tenn., for defendants.

John R. Steer, Gen. Counsel, U.S. Sentencing Com'n, Washington, D.C., amicus curiae for Government.

Alan C. Morrison, Washington, D.C., pro hac vice on behalf of defendants.

Before WISEMAN, Chief Judge, and NIXON and HIGGINS, District Judges.

## MEMORANDUM

Defendants in the above-captioned cases have moved for an order declaring invalid and unenforceable the United States Sentencing Guidelines ("Sentencing Guidelines" or "Guidelines") promulgated by the United States Sentencing Commission ("Sentencing Commission" or "Commission") on the grounds that they are unconstitutional and contravene Congress' statutory intent. We, the United States District Court Judges for the Middle District of Tennessee, sitting en banc, having fully reviewed the briefs submitted by defendants, the Department of Justice, and the

Commission,[1] having heard oral argument on May 20, 1988, and for the reasons stated herein, hereby FIND as follows:

Defendants all have been charged with and/or convicted of federal crimes. The Court does not pause to make a detailed recitation of the facts in each defendant's case because their motion, as framed at oral argument, does not turn on a consideration of individual factual matters.

In their briefs, defendants assert a number of challenges to the Guidelines. First, they assert that the manner in which the Commission is formed violates the constitutional separation of powers because (1) judges may not constitutionally serve on the Commission, (2) placement of the Commission in the judicial branch impairs judicial functions, and (3) if the Commission is part of the judicial branch, then the President's removal power is impermissible. Second, defendants contend that Congress violated the nondelegation doctrine, which also has its roots in the constitutional separation of powers, by (1) delegating to the Commission the task of fixing penalties for violations of federal criminal statutes, and (2) by failing to provide sufficient standards for the Commission to guide it in performing this task. Third, defendants assert that the Guidelines contravene the Due Process Clause because they improperly limit a judge's discretion in sentencing. Finally, defendants contend that the Guidelines are inconsistent with Congress' statutory intent[2] and that the Commission's submission of the Guidelines to Congress was untimely.

In this Memorandum, the Court addresses defendants' claim that Congress violated the nondelegation doctrine. More specifically, the Court considers only whether Congress unconstitutionally granted the Commission power to exercise a nondelegable legislative function.

## I

## STATUTORY FRAMEWORK

The Court begins its analysis by reviewing the statutory framework pursuant to which the Commission was formed and the Guidelines were promulgated. In 1984, Congress enacted the Comprehensive Crime Control Act, Pub L. 98–473, 98 Stat. 1976, *amended by* Pub.L. 99–217, §§ 2, 4, 99 Stat. 1728 (1985); Pub.L. 100–182, 101 Stat. 1266 (1987). Chapter II of Title II of that act, the Sentencing Reform Act of 1984 (the "Sentencing Act" or "Act"), 98 Stat. 1987, effected a comprehensive revision of federal sentencing law. Congress enacted this legislation after concluding that the existing system of federal sentencing suffered from several interrelated flaws. Congress found that the concepts of indeterminate sentencing and parole release were based on an "outdated rehabilitation model" that "most sentencing judges as well as the Parole Commission agree ... is not an appropriate basis for sentencing decisions." S.Rep. No. 225, 98th Cong., 1st Sess. 38, 40 (1983) [hereinafter "S.Rep."], *reprinted in* 1984 U.S. Code Cong. & Admin.News 3182, 3221, 3223 [hereinafter "U.S.C.C.A.N."]. Congress further found that "every day Federal judges mete out an unjustifiably wide range of sentences to offenders with similar histories, convicted under similar circumstances." *Id.* at 38, U.S.C.C.A.N. at 3221. Moreover, Congress noted that the earlier nonmandatory guidelines promulgated by the United States Parole Commission had "faile[ed] in practice to achieve

---

1. The Commission was granted permission to participate in this matter as amicus curiae pursuant to an Order entered by Judge John T. Nixon on May 3, 1988.

2. Defendants identify the following alleged inconsistencies:

(1) The Commission improperly diminished the availability of probation as a sentence.
(2) The Guidelines will contribute significantly to prison overcrowding.

(3) The Guidelines improperly make supervisory release mandatory and require imposition of the maximum term.
(4) Fines improperly are made mandatory by the Guidelines.
(5) The policy statement regarding reduction of the Guidelines sentence for a defendant's cooperation is inconsistent with the Sentencing Act.
(6) The Guidelines' procedure for computing a defendant's criminal history serve to perpetuate unwarranted disparity in sentencing.

their goal of reducing unwarranted sentencing disparities" and even "contribute[d] to disparity" in some instances. *Id.* at 48, U.S.C.C.A.N. at 3231. As a result of these flaws, Congress concluded, the existing sentencing approach engendered pervasive "uncertainty about the length of time offenders will serve in prison," *id.* at 49, U.S.C.C.A.N. at 3232, and "lack[ed] the sureness that criminal justice must provide if it is to retain the confidence of American society and if it is to be an effective deterrent against crime," *id.* at 49–50, U.S.C.C.A.N. at 3232–33.

One of the most significant aspects of this legislation was that it created the Sentencing Commission as an independent agency in the judicial branch of the federal government, 28 U.S.C. § 991(a), and authorized it to promulgate sentencing guidelines and policy statements that would be binding on the federal courts in imposing sentences in criminal cases, *id.* at § 994(a)(1). The Commission is composed of seven voting members who are appointed by the President, with the advice and consent of the Senate, who can be removed by the President "for neglect of duty or malfeasance in office or for other good cause shown." *Id.* at § 991(a).[3] Three voting members are Article III judges selected from a list of six judges recommended to the President by the Judicial Conference of the United States. *Id.*

As part of the Sentencing Act, Congress provided that the Commission, in establishing the Guidelines, was to "assure the meeting of the purposes of sentencing," *id.* at § 991(b)(1)(A), which Congress identified as: (1) deterrence of criminal conduct, (2) protection of the public from further crimes, (3) rehabilitation of the defendant, and (4) punishment of the defendant commensurate with the seriousness of the offense, 18 U.S.C. § 3553(a)(2). Congress further stated that the Guidelines were to

> provide certainty and fairness in meeting the purposes of sentencing, [avoid] unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices ... [and] reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process.

28 U.S.C. § 991(b)(1)(B)–(C).

In determining the sentence to be imposed for different criminal acts, Congress granted the Commission broad authority to determine: (1) whether to impose a sentence of probation, a fine, or a term of imprisonment; (2) the appropriate amount of a fine or the appropriate length of a term of probation or a term of imprisonment; (3) whether a sentence to a term of imprisonment should include a requirement that the defendant be placed on a term of supervised release after imprisonment, and, if so, the appropriate length of such a term; and (4) whether multiple sentences to terms of imprisonment should be ordered to run concurrently or consecutively. *Id.* at § 994(a)(1). Congress also provided more specific guidance in a number of areas, including establishing a sentencing range, *see id.* at § 994(b), (h), (i) & (j), identifying categories of offenses and defendants, *see id.* at § 994(c)-(d), and rewarding a defendant's assistance in the investigation or prosecution of another person, *see id.* at § 994(n).

Pursuant to Congress' grant of authority, the Commission formulated the Sentencing Guidelines. The Guidelines are extremely detailed, covering over 200 pages of text, and are organized roughly as follows. First, within each category of crimes, "base offense levels" from 1 to 43 are listed that translate into ascending terms of punishment. Second, point adjustments in the base offense level are made upward and downward based on a number of considerations, including a de-

---

3. The Chairman of the United States Parole Commission and a designee of the Attorney General of the United States also serve as ex-officio, non-voting members of the Commission. *Id.*

fendant's relationship to the victim, role in the offense, obstruction of justice, criminal history, cooperation with law enforcement officers, and acceptance of responsibility. Once a final numerical designation is formulated, the sentencing range to be applied is ascertained by consulting a table that specifies the correlation between the numerical designation and a sentencing range.

Pursuant to the requirements of the Sentencing Act, the Commission submitted to Congress an initial formulation of the Guidelines, and a Report stating the reasons for the Commission's recommendations, on April 13, 1987. *See* Sentencing Act, § 235(a)(1)(B)(ii)(I), 98 Stat. 2032. The Commission also submitted a Supplementary Report to Congress on June 18, 1987. The General Accounting Office then conducted a study and reported to Congress its views regarding the potential impact of the Guidelines on the criminal justice system. *See id.* at § 235(a)(1)(B)(ii)(II), 98 Stat. 2032. The entire congressional review process was to take six months. Pursuant to the Act, the Guidelines subsequently took effect, without direct action by Congress, on November 1, 1987. *Id.* at § 235(a)(1), 98 Stat. 2031. They are applicable to offenses committed on or after that date.

Since November 1, 1987, sentencing courts have been required to

> impose a sentence of the kind, and within the range, referred to in [the Guidelines] unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.

18 U.S.C. § 3553(b). In addition, the sentencing court, at the time of sentencing, must "state in open court the reasons for its imposition of the particular sentence." *Id.* at 3553(c).

The Sentencing Act also effected other important changes in the criminal justice system, the most important of which is the eventual elimination of the United States Parole Commission. Sentencing Act, §§ 218(a)(5), 235, 98 Stat. 2027, 2031–34. With the imposition of "real time" sentences, 18 U.S.C. § 3624(a)-(b), in contrast to the previous practice of imposing indeterminate sentences, the function served by the Parole Commission will no longer be required. In addition, the Act prohibits probation for certain types of offenses, *id.* at §§ 3561–68, and provides for heightened appellate review of sentences, *id.* at § 3742.

## II

### STANDARD OF REVIEW

■ As a preliminary matter, the Court must articulate the appropriate standard for determining the constitutionality of Congress' delegation to the Commission. The Supreme Court has recognized that this duty "is the greatest and most delicate duty that this Court is called upon to perform." *Blodgett v. Holden,* 275 U.S. 142, 147–48, 48 S.Ct. 105, 106–07, 72 L.Ed. 206 (1928). In performing this duty, we are aware of the admonition that a statute must be construed, whenever possible, to save it from unconstitutionality. *Driscoll v. Edison Light & Power Co.,* 307 U.S. 104, 114–15, 59 S.Ct. 715, 720, 83 L.Ed. 1134 (1939). Further, we recognize that the wisdom of a particular congressional determination is not for us to judge.

> Its wisdom is not the concern of the courts; if a challenged action does not violate the Constitution, it must be sustained:
>> "Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end. We do not sit as a committee of review, nor are we vested with the power of veto." *TWA v. Hill,* 437 U.S. 153, 194–195, 57 L.Ed.2d 117, 98 S.Ct. 2279 [2301–02] (1978).
>
> By the same token, the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution.

*Immigration & Naturalization Service v. Chadha,* 462 U.S. 919, 944, 103 S.Ct. 2764, 2780–81, 77 L.Ed.2d 317 (1983).

## III

## RIPENESS

Another threshold question that must be addressed by the Court is whether defendants' motion is ripe for decision. Although the concept of ripeness lacks precise formulation and consistent application, "[i]ts basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 580, 105 S.Ct. 3325, 3333, 87 L.Ed.2d 409 (1985). The question of ripeness turns on a balance of two broad factors: the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed. 2d 752 (1983) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1516, 18 L.Ed.2d 81 (1967)). When an issue is "purely legal, and will not be clarified by further factual development," *Thomas,* 473 U.S. at 581, 105 S.Ct. at 3333, courts are more inclined to find a challenge ripe for consideration. *Pacific Gas & Electric Co.,* 461 U.S. at 201, 103 S.Ct. at 1720.

In the instant cases, the Court finds that both of the above factors militate in favor of a finding that the issues presented are ripe for determination. First, with respect to fitness for judicial decision, the issues now before the Court are purely legal and require no further factual development. Further, resolution of these issues is not addressed to uncertain and future events that may never occur, the central concern underlying the fitness for review factor. *Thomas,* 473 U.S. at 580, 105 S.Ct. at 3333. The Guidelines are immediately applicable to the cases now before the Court. Second, with respect to the hardship to the parties of withholding consideration, the needs of the parties for a determination are substantial. First and foremost, defendants in the instant cases need to decide whether to enter a guilty plea or to risk trial. Essential to this determination is knowledge of the possible sentence that may be imposed. More broadly, the longer the constitutionality of the Guidelines remains uncertain, the more deeply this Court and the criminal justice system will be impacted. "Nothing would be gained by postponing a decision, and the public interest would be well served by a prompt resolution of the constitutionality of" the provisions of Sentencing Act in question. *See id.* at 582, 105 S.Ct. at 3334.

For the foregoing reasons, the Court finds that the constitutional issue presented in the instant cases is ripe for consideration.

## IV

## HISTORICAL ANALYSIS OF THE NONDELEGATION DOCTRINE

### A. SEPARATION OF POWERS

The roots of the nondelegation doctrine are found in the tripartite separation of powers embodied in the Constitution. In separating executive, legislative, and judicial powers, the Framers of the Constitution sought to provide "the foundation of a structure of government that would protect liberty." *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 3186, 92 L.Ed.2d 583 (1986). The most notable proponent of the separation of powers principle was Baron De Montesquieu, who, in 1748, enunciated the classic statement of the importance of this principle to the preservation of liberty:

> The political liberty of the subject is a tranquility of mind arising from the opinion each person has of his safety. In order to have this liberty, it is requisite that the government be so constituted as one man need not be afraid of another.
>
> When the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty; because apprehensions may arise, lest the same monarch or sen-

ate should enact tyrannical laws, to execute them in a tyrannical manner.

Again, there is no liberty, if the judiciary power be not separated from the legislative and executive. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would be then the legislator. Were it joined to the executive power, the judge might behave with violence and oppression.

Montesquieu, *Spirit of Laws*, Bk. 11, ch. 6 (1748), *reprinted in* 1 *The Founders' Constitution*, 623, 624–25 (P. Kurland & R. Lerner eds. 1987) [hereinafter *The Founders' Constitution* ].

Some decades later, in 1776, this same sentiment was evident in the "Instructions of the Inhabitants of the Town of Boston to Their Representatives in Congress:"

It is essential to liberty, that the legislative, judicial, and executive powers of government be, as nearly as possible, independent of, and separate from each other; for where they are united in the same persons, or number of persons, there would be wanting that mutual check which is the principal security against the making of arbitrary laws, and a wanton exercise of power in the execution of them.

*Reprinted in* H. Niles, *Principles and Acts of the Revolution in American* (1876); 1 *The Founders' Constitution, supra,* at 319. Finally, James Madison, in The Federalist No. 47, stated that "the accumulation of all powers legislative, executive and judiciary in the same hands ... may justly be pronounced the very definition of tyranny." *Reprinted in* 1 *The Founders' Constitution, supra,* at 325.

A separation of powers, however, does not of necessity imply that there must be "three airtight departments of government." *Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977). Instead, this principle is designed "to assure, as nearly as possible, that each branch of government ... confine[s] itself to its assigned responsibility." *Chadha,* 462 U.S.

at 951, 103 S.Ct. at 2784. *See* The Federalist No. 48 (J. Madison). The "separation of powers ... did not make each branch completely autonomous, ... [but] left each ... dependent upon the others, as it left to each ... [the exercise of] functions in their nature executive, legislative and judicial." *Myers v. United States,* 272 U.S. 52, 291, 47 S.Ct. 21, 84, 71 L.Ed. 160 (1926) (Brandeis, J., dissenting). Indeed, the Constitution expressly creates an overlap in the powers and responsibilities of the different branches:

After all, the Constitution on its face contemplates that the Executive will perform a "legislative" function when exercising the power to veto legislation; that the House will indict and the Senate adjudicate in cases of impeachment; and that the Supreme Court will "make" such laws as it must in expounding or modifying the corpus of federal legal principle pursuant to its exercise of the judicial power under article III.

L. Tribe, *American Constitutional Law* 19 (2d ed. 1988) [hereinafter "Tribe"].

The lines of demarcation between the powers and responsibilities of each of the branches, however, are not always clear.

[T]here is a zone of twilight in which [the President] and Congress [and, by implication, the Supreme Court] may have concurrent authority, or in which [the] distribution [of power] is uncertain.... In this area, any actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract theories of law.

*Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 637, 72 S.Ct. 863, 871, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). In light of this uncertainty, the Supreme Court has adopted a flexible approach in analyzing separation of powers issues that allows the structure of our government to evolve within the bounds established by the Constitution. "[I]n determining whether [an] Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it

prevents [one branch] from accomplishing its constitutionally assigned functions." *Nixon*, 433 U.S. at 443, 97 S.Ct. at 2790.[4]

## B. DELEGATION OF LEGISLATIVE POWERS

The problems associated with the delegation of legislative powers were debated long before the Constitution was formed. According to John Locke, legislative power is nondelegable:

> The *Legislative cannot transfer the Power of Making Laws* to any other hands. For it being but a delegated Power from the People, they, who have it, cannot pass it over to others.... The power of the *Legislative* being derived from the people by a positive voluntary Grant and Institution, can be no other, than what the positive Grant conveyed, which being only to make *Laws,* and not to make *Legislators,* the *Legislative* can have no power to transfer their Authority of making Laws, and place it in other hands.

J. Locke, *Two Treatises of Government* (Second Treatise) 380–81 (P. Laslett ed. 1965) (emphasis in original). *See* Aranson, Gellhorn & Robinson, *A Theory of Legislative Delegation,* 68 Cornell L.Rev. 1, 5 (1982) [hereinafter "Aranson"]. The nondelegation doctrine is founded on the theory that Congress alone can exercise "[t]he essentials of the legislative function, [which] are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct." *Yakus v. United States,* 321 U.S. 414, 424, 64 S.Ct. 660, 667, 88 L.Ed. 834 (1944). "Formulation of policy is a legislature's primary responsibility, entrusted to it by the electorate." *United States v. Robel,* 389 U.S. 258, 276, 88 S.Ct. 419, 430, 19 L.Ed.2d 508 (1976) (Brennan, J., concurring). More specifically, the nondelegation doctrine is regarded as essential to the preservation of two constitutional safeguards that protect each individual's liberty and property: congressional accountability and judicial review. *See* Schoenbrod, *The Delegation Doctrine: Could The Court Give It Substance?,* 83 Mich.L. Rev. 1223, 1283 (1985) [hereinafter "Schoenbrod"]. Justice Harlan emphasized the importance of these safeguards in *Arizona v. California,* 373 U.S. 546, 626, 83 S.Ct. 1468, 1511, 10 L.Ed.2d 542 (1963) (Harlan, J., dissenting in part):

> The [nondelegation] principle ... serves two primary functions vital to preserving the separation of powers required by the Constitution. *First,* it insures that the fundamental policy decisions in our society will be made not by an appointed official but by the body immediately responsible to the people. *Second,* it prevents judicial review from becoming merely an exercise at large by providing the courts with some measure against which to judge the official action that has been challenged.

---

**4.** In two other recent cases, the Supreme Court has found that Congress violated the constitutional separation of powers by reserving to itself powers that can be exercised only by the President. First, in *Immigration & Naturalization Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), the Court declared unconstitutional a statutory provision authorizing either House of Congress to veto a decision of the executive branch whether to allow a particular deportable alien to remain in the United States. The Court concluded: "Congress must abide by its delegation of authority until that delegation is legislatively altered or revoked." *Id.* at 955, 103 S.Ct. at 2786. Second, in *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), the Court declared unconstitutional a provision of the Balanced Budget and Emergency Deficit Control Act of 1985, 2 U.S.C. § 901, *et seq.,* popularly known as the Gramm–Rudman–Hollings Act, in which Congress reserved the power to remove the Comptroller General, who was charged with the execution of the Act. The Court found that "[a] direct congressional role in the removal of officers charged with the execution of the laws [except by impeachment] is inconsistent with separation of powers." 106 S.Ct. at 31.

In addition, the Supreme Court has heard oral argument in the case of *Morrison v. Olson, prob. juris. noted,* —— U.S. ——, 108 S.Ct. 1010, 98 L.Ed.2d 976 (1988), which involves the constitutionality of a provision of the Ethics in Government Act of 1978, 28 U.S.C. §§ 49, 591–98, which provides for appointment of an independent counsel by a special court composed of three federal judges. Regrettably, we cannot wait for a decision to be rendered in this important case.

(emphasis in original) (footnote omitted).[5]

The Framers of the Constitution no doubt had these concepts in mind when they endowed Congress with broad legislative powers. Article I, Section 1, provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." Article I, Section 8, further provides that Congress is authorized "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its enumerated powers and "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." Under the necessary and proper clause, the Supreme Court has held that congressional power "implies a power [to delegate] authority under it sufficient to effect its purposes." *Lichter v. United States*, 334 U.S. 742, 748, 68 S.Ct. 1294, 1298, 92 L.Ed. 1694 (1948).

From the beginning of our government, Congress has delegated limited powers to executive officers and judges. The Supreme Court has upheld most such congressional delegations, but it consistently has recognized that Congress' constitutional authority to delegate its powers is not unfettered.

In *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 6 L.Ed. 253 (1825), the Supreme Court considered a challenge to the constitutionality of a delegation by Congress to the judiciary. The Process Act of 1792, 1 Stat. 275, provided that federal courts, in adjudicating suits at law, were to use the state rules in effect in 1789. The act, however, also provided that this requirement was "subject ... to such alterations and additions as said courts [of the United States] respectively shall, in their discretion, deem expedient." *Id.* Chief Justice Marshall, in upholding the constitutionality of Congress' delegation of this power to the judiciary, acknowledged the difficulty faced in distinguishing the legislative power to make laws from the administrative authority to make rules and regulations:

> It will not be contended that Congress can delegate to the courts, or to any other tribunals, powers which are strictly and exclusively legislative. But Congress may certainly delegate to others powers which the legislature may rightfully exercise itself.... The line has not been exactly drawn which separates those important subjects which *must* be entirely regulated by the legislature itself, from those of less interest, in which a general provision may be made, and power given to those who are to act under such general provisions to fill up the details.

*Wayman*, 23 U.S. (10 Wheat.) at 43 (emphasis added).

The next Supreme Court decision that significantly contributed to this area of law was not decided until 1928. In *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928), Congress authorized the President, through the regulation of customs duties, to equalize differences between the cost of producing certain articles in the United States and in competing foreign countries. Upholding this broad congressional delegation of authority, the Supreme Court articulated what has become the principal test for determining the constitutionality of most congressional delegations:

---

**5.** More broadly stated, the nondelegation doctrine is derived from the contractarian view that "laws derive their legitimacy from the consent of the governed and, in the American polity, the constitutional delegation of lawmaking power to the Congress establishes this consent." *Aranson, supra,* at 5. As stated by Professor Tribe:

> In general, limits on congressional capacity to delegate responsibility derive from the implicit constitutional requirements of consensual government under law. Under any theory that finds legitimacy in the supposed consent of the governed within a framework of constitutional limitations, the cooperative exercise of accountable power presupposes the possibility of tracing every such exercise to a choice made by one of the "representative" branches, a choice for which someone can be held both politically and legally responsible.... Thus, the valid exercise of congressionally delegated power depends upon the prior "adoption of [a] declared policy by Congress and its definition of the circumstances in which its command is to be effective ..." [*Opp Cotton Mills, Inc. v. Administrator*, 312 U.S. 126, 144, 61 S.Ct. 524, 532, 85 L.Ed. 624 (1941)].

Tribe, *supra*, at 364.

If Congress shall lay down by legislative act an *intelligible principle* to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power.

*Id.* at 409, 48 S.Ct. at 352 (emphasis added). Later cases have not altered fundamentally the *Hampton* "intelligible principle" test, although its vagueness, according to one commentator, "has allowed the interpretation of the delegation doctrine to swing like a pendulum with the changing politics of the [Supreme] Court and the times." Schoenbrod, *supra,* at 1224.

The Supreme Court, through the mid–1930s, upheld broad congressional delegations to various regulatory agencies despite a lack of specific statutory guidance. For example, in *New York Central Securities Corp. v. United States,* 287 U.S. 12, 24, 53 S.Ct. 45, 48, 77 L.Ed. 138 (1932), the Court sustained a delegation of power to the Interstate Commerce Commission for the regulation of the ownership and control of railroad systems under a "public interest" criterion. That same term, the Court decided *Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co.,* 289 U.S. 266, 285, 53 S.Ct. 627, 636, 77 L.Ed. 1166 (1933), in which it found that a grant of power to the FRC to assign radio frequencies "as public convenience, interest or necessity requires" was not so "indefinite as to confer an unlimited power." *See FTC v. R.F. Keppel & Brothers, Inc.,* 291 U.S. 304, 309–12, 54 S.Ct. 423, 425–26, 78 L.Ed. 814 (1934). Thus, up through 1934, Congress and the Supreme Court ushered in an age of ever more sweeping congressional delegations of powers to administrative agencies.

The nondelegation doctrine briefly was reinvigorated in 1935 when the Supreme Court struck down two provisions of the National Industrial Recovery Act ("NIRA"), 48 Stat. 195, on the ground that Congress had failed to provide the requisite intelligible principle to guide those administering the provisions of the NIRA. In *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), the Court considered the constitutionality of a section of the NIRA that authorized the President to prohibit the interstate transportation of certain petroleum products. The provision was designed to raise the price of petroleum products by restricting the supply of such products entering the marketplace. The Court struck down this provision because "Congress has declared no policy, has established no standard, has laid down no rule. There is no requirement, no definition of circumstances and conditions in which the transportation is to be allowed or prohibited." *Id.* at 430, 55 S.Ct. at 252.

Shortly thereafter, the Supreme Court decided *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), which concerned the constitutionality of the NIRA provisions that empowered trade associations to create codes of fair competition. Finding these provisions to be an unconstitutional delegation, the Court concluded: "In view of … the nature of the few restrictions that are imposed, the discretion of the President in … enacting laws for the government of trade and industry throughout the country, is virtually unfettered." *Id.* at 541–42, 55 S.Ct. at 848. Even Justice Cardozo, who had dissented in *Panama Refining,* found these provisions to be unconstitutional: "The delegated power of legislation which has found expression in this code is not canalized within banks that keep it from overflowing. It is unconfined and vagrant." *Id.* at 551, 55 S.Ct. at 852 (Cardozo, J., concurring).

These two cases in which the nondelegation doctrine was invoked, and which "might have presaged a new life for a moribund constitutional rule," *Aranson, supra,* at 10, proved to be the Supreme Court's last application of the doctrine to overturn congressional delegations of power that lacked sufficient standards. Three years later, the Supreme Court decided *United States v. Rock Royal Co-op, Inc.,* 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939), in which it upheld as providing the requisite intelligible principle a delegation to the Secretary of Agriculture of the power to set prices for agricultural products to

give producers a "parity in purchasing power" between current prices and those received during a designated base period. Similarly, in *Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944), which involved a wartime measure that gave the Office of Price Administration extensive powers to fix commodity prices "in the interest of the national defense and security," the Court held that "[t]he standards prescribed by the present Act ... are sufficiently definite and precise ... to ascertain whether the Administrator ... has conformed to these standards." *Id.* at 426, 64 S.Ct. at 668. *See American Power & Light Co. v. SEC,* 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103 (1946); *Lichter v. United States,* 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948); *Fahey v. Mallonee,* 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2130 (1947). The decline of the nondelegation doctrine in the post-New Deal era has prompted one commentator to note that the "intelligible principle" test has become "all but a vestigial euphemism, virtually shorn of practical meaning." Schwartz, *Of Administrators and Philosopher—Kings: The Republic, the Laws, and Delegations of Power,* 72 Nw.U.L.Rev. 443, 446 (1977).

■ A more recent decision by the Supreme Court, however, suggests that the pendulum may again have begun to swing against broad delegtion. In *National Cable Television Association, Inc. v. United States,* 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), the Court considered the validity of an appropriations statute instructing agencies to charge for the benefits that their actions confer on private individuals or groups. The Court, acknowledging that a broad construction of this statute would raise significant constitutional issues, narrowly construed it to allow agencies to set fees to recoup only the costs of specific benefits conferred, and not, as the FCC had attempted to do, to recoup the full costs of regulating. The Court concluded: "Whether the present Act meets the requirement of *Schechter* and *Hampton* is a question we do not reach. But the hurdles revealed in those decisions lead us to read the Act narrowly to avoid constitutional problems." *Id.* at

342, 94 S.Ct. at 1150. Thus, *National Cable Television* teaches that if administrative action relates to an important legislative prerogative, such as taxation, Congress must provide a clear statement that it is delegating the power to regulate in that area.

## C. DELEGATIONS INVOLVING FUNDAMENTAL RIGHTS

■ Congressional delegations involving fundamental rights have come under special scrutiny by the Supreme Court. The Court, in two decisions, has recognized that if an administrative action involves a fundamental right, the Court will not presume that Congress has attempted to delegate the power to regulate the exercise of that right without a "clear statement" of congressional intent.

In *Kent v. Dulles,* 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), the Court invalidated a regulation permitting the Secretary of State to refuse to issue a passport because of an applicant's membership in the Communist party. Concluding that the Secretary had exceeded his statutory authority, the Court reasoned that Congress had not expressly delegated to the Secretary that power, and such a generalized power could not be inferred.

> The right to travel is a part of the "liberty" of which the citizen cannot be deprived without the due process of law under the Fifth Amendment.
>
> . . . .
>
> If that "liberty" is to be regulated, it must be pursuant to the lawmaking functions of the Congress. And if that power is delegated, the standards must be adequate to pass scrutiny by the accepted tests. Where activities or enjoyment, natural and often necessary to the well-being of an American citizen, such as travel, are involved, we will construe narrowly all delegated powers that curtail or dilute them. We hesitate to find in this broad generalized power an authority to trench so heavily on the rights of the citizen.

*Id.* at 125, 129, 78 S.Ct. at 1118, 1120 (citations omitted). By narrowly construing the statute in question, the Court avoided the constitutional issue. It noted, however, that "[w]e would be faced with important constitutional questions were we to hold that Congress ... had given the Secretary authority to withhold passports to citizens because of their beliefs or associations." *Id.* at 129–30, 78 S.Ct. at 1120.

In *Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), the Court refused to find an implicit congressional delegation of authority to the Department of Defense to administer a constitutionally questionable security clearance program. In invalidating this program, the Court began by acknowledging that "the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment." *Id.* at 492, 79 S.Ct. at 1411. The Court then stated that delegations of authority to affect such an interest

> must be made explicitly not only to assure that individuals are not deprived of cherished rights under procedures not actually authorized, ... but also because explicit action, especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting and implementing our laws. Without explicit action by lawmakers, decisions of great constitutional import and effect would be relegated by default to administrators who, under our system of government, are not endowed with authority to decide them.

*Id.* at 507, 79 S.Ct. at 1419. The Court concluded, "Such decisions [to delegate]

cannot be assumed by acquiescence or nonaction." *Id.*

## D. CONCLUSIONS FROM HISTORICAL ANALYSIS

From the above analysis, a general framework for evaluating nondelegation questions can be derived. First, the Supreme Court's decision in *Kent*, 357 U.S. at 129, 79 S.Ct. at 1120, and *Greene*, 360 U.S. at 507, 79 S.Ct. at 1419, teach that if an administrative action implicates a fundamental right—such as the right to travel or to hold employment—Congress' statutory delegation must be scrutinized closely. If a narrow construction of the statute fails to indicate that Congress intended for the administrative agency to promulgate rules involving the fundamental right, those rules will be found to be unauthorized by statute. Such a finding avoids the question of whether Congress could under any circumstances delegate such power.

■ Second, the Supreme Court consistently has recognized that some legislative powers are nondelegable. The Court, however, has never invalidated a delegation on this basis. As a result, no listing of nondelegable functions can be articulated.[6]

■ Third, the Supreme Court has recognized that Congress has the authority to delegate many functions, but that Congress, at a minimum, must articulate an "intelligible principle" to guide federal officials in the conduct of their delegated duties. The parameters of this authority are best identified by a comparison between, on the one hand, the two New Deal cases, *Panama Refining*, 293 U.S. at 430, 55 S.Ct. at 252, and *Schecter*, 295 U.S. at

6. Professor Tribe contends that the language of the Constitution clearly proscribes certain delegations:

> For example, if the Senate, by a two-thirds vote, set up a special agency outside Congress to approve or veto all future treaties, such action would almost surely fail to satisfy the requirement of article II, § 2, that presidentially negotiated treaties become effective only upon "the Advice and Consent of the Senate ... provided two thirds of the Senators present concur ..." Similarly, Congress could not set up a Federal Court of Impeach-

> ment to try all impeachments: according to article I, § 3, "The Senate shall have the sole Power to try all Impeachments."

*Tribe, supra,* at 363 (footnote omitted). The United States District Court for the District of Columbia, on the other hand, has determined that there are no nondelegable "core functions" because "judicial adoption of a 'core functions' analysis would be effectively standardless." *Synar v. United States,* 626 F.Supp. 1374, 1385 (D.D.C.1986), *aff'd on other grounds, Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986).

541–42, 55 S.Ct. at 848, in which legislation was invalidated on the ground that it failed to provide adequate guidance, and, on the other hand, subsequent caselaw such as *Yakus*, 321 U.S. at 426, 64 S.Ct. at 668, in which the Court has found "the interest of the national defense and security" to be an "intelligible principle."

■ More broadly, the above caselaw further teaches that Congress' power to delegate narrows as the constitutional interest involved becomes more fundamental. Hence, the nondelegation doctrine properly is viewed as forming a continuum. On one end, broad delegations involving the regulation of economic activity generally are permissible. *See Yakus*, 321 U.S. at 426, 64 S.Ct. at 668. In the center, narrow delegations implicating important legislative functions, such as taxation, are permissible, but only if Congress expresses a clear intent to delegate such authority. *See National Cable Television*, 415 U.S. at 342, 94 S.Ct. at 1150. At the other end of the continuum, no delegations involving as yet unidentified fundamental rights are permissible.

## V

### APPLICATION OF THE NONDELEGATION DOCTRINE TO THE SENTENCING REFORM ACT

In determining the constitutionality of Congress' delegation to the Commission, the Court begins by considering whether a narrow construction of the Sentencing Act would render a constitutional determination unnecessary. We then consider the development of caselaw concerning Congress' delegations involving criminal sanctions. Finally, we consider whether Congress, through the Sentencing Act, has granted to the Commission the authority to exercise a nondelegable legislative function.

The Court begins by considering whether the constitutional question need be reached. The Supreme Court, in *Kent*, 357 U.S. at 129–30, 79 S.Ct. at 1120, and *Greene*, 360 U.S. at 507, 79 S.Ct. at 1419, held that congressional delegations involving fundamental rights, of which sentencing plainly is one, must be narrowly construed. If such a construction results in invalidation of a challenged administrative action, then the constitutional issue need not be addressed. Looking to the instant case, we find that even if the Sentencing Act is narrowly construed, we come to the conclusion that Congress plainly intended that the Guidelines be promulgated by the newly formed Commission.

■ In addressing the issue of the constitutionality of delegations involving criminal sanctions, we first must recognize that no liberty is more precious under our Constitution than an individual's right to be free of wrongfully imposed criminal sanctions, such as the loss of one's freedom through incarceration or, perhaps, even death. The Supreme Court, based on this recognition, long has held that only Congress may declare conduct to be a crime. In *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 3 L.Ed. 259 (1812), the Court considered whether defendants, who had secretly given two million dollars as a present to Bonaparte for leave to make a treaty with Spain, could be criminally prosecuted under a common-law theory of libel on the President and Congress. The Court rejected this theory on the ground that because federal law recognized no common-law crimes, only Congress could declare conduct to be a crime.

> The legislative authority of the Union must first make an act a crime, affix a punishment to it, and declare the court that shall have jurisdiction of the offense.
>
> Certain implied powers must necessarily result to our courts of justice from the nature of their institution. But jurisdiction of crimes against the state is not among those powers.

*Id.* at 34. Shortly thereafter, in *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 5 L.Ed. 37 (1820), the Court considered whether a murder that had occurred aboard a boat on a river in China had taken place on the "high seas" within the meaning of a federal criminal statute. In finding that no conduct violative of federal law had occurred, the Court stated:

The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the court, which is to define a crime, and ordain its punishment.

*Id.* at 95. *See Viereck v. United States,* 318 U.S. 236, 241, 63 S.Ct. 561, 563, 87 L.Ed. 734 (1943).

█ Similarly, the Supreme Court has acknowledged repeatedly that only Congress may fix the punishment for engaging in criminal conduct. In *Ex Parte United States,* 242 U.S. 272, 37 S.Ct. 72, 61 L.Ed. 129 (1911), the Court considered whether a federal judge could suspend the execution of a statutorily prescribed minimum mandatory sentence. In determining that the lower court had no such discretion, the Supreme Court observed:

Indisputably under our constitutional system the right to try offenses against the criminal laws, and, upon conviction, to impose the punishment provided by the law, is judicial.... [But it is] indisputable that the authority to define and fix the punishment for crime is legislative.

*Id.* at 41–42, 37 S.Ct. at 74. The Court reiterated this sentiment in *Gore v. United States,* 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed. 2d 1405 (1958), in which a defendant challenged the imposition of cumulative sentences for a single narcotics transaction. In rejecting this challenge, the Court emphasized that the decision whether such a sentence should be imposed is, in the first instance, a congressional prerogative.

In effect, we are asked to enter the domain of penology, and more particularly that tantalizing aspect of it, the proper apportionment of punishment. Whatever views may be entertained regarding severity of punishment, whether one believes in its efficacy or its futility, ... these are peculiarly questions of legislative policy.

*Id.* at 393, 78 S.Ct. at 1285. To the same effect was the Court's holding in *Rummel v. Estelle,* 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), in which a challenge to Texas' recidivism statute was rejected.

Penologists themselves have been unable to agree whether sentences should be light or heavy, discretionary or discriminate. This uncertainty reinforces our conviction that any "nationwide trend" toward lighter, discretionary sentences must find its source and its sustaining force in the legislature.

*Id.* at 283–84, 100 S.Ct. at 1144 (footnotes omitted).

The Supreme Court, however, has recognized that determining the sentence to be served by a defendant is not a purely legislative function.

[T]oday the extent of a federal prisoner's confinement is initially determined by the sentencing judge, who selects a term within an often broad, congressionally prescribed range; release on parole is then available on review by the United States Parole Commission which, as a general rule, may conditionally release a prisoner any time after he serves one-third of the judicially fixed term.

*United States v. Grayson,* 438 U.S. 41, 47, 98 S.Ct. 2610, 2614, 57 L.Ed.2d 582 (1978) (citation and footnote omitted). Understanding the extent to which each branch shares in the responsibility for ensuring the effective operation of our criminal justice system is central to the issue of whether Congress' delegation to the Commission was constitutional. Accordingly, a closer examination of each branch's function would be appropriate.

First, the executive branch plays an important role in the criminal justice system through the pardon power, the prosecutorial function, the United States Parole Commission, and administrative rulemaking. Two of these functions, the pardon power and the prosecutorial function, are derived directly from Article II of the Constitution. The pardon power is provided for expressly in the language of the Constitution, and the prosecutorial function plainly is an executive, not legislative, function. *United*

*States v. Nixon*, 418 U.S. 683, 693, 94 S.Ct. 3090, 3100, 41 L.Ed.2d 1039 (1974) ("the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case") (citations omitted). The prosecutorial power is derived from Article II, Section 3 of the Constitution, which provides that the President "shall take care that the Laws [shall] be faithfully executed." *See Pugach v. Klein*, 193 F.Supp. 630, 634 (D.D.C.1961).

Through the United States Parole Commission, an independent agency in the Department of Justice, the executive branch has jurisdiction over parole decisions for all persons imprisoned for criminal offenses that occurred before November 1, 1987. 18 U.S.C. § 4202 (1982). The Supreme Court has not rendered a decision concerning the constitutionality of the Parole Commission, but lower courts have found no delegation problem so long as "[t]he release decision was within both the broad ranges allowed by statute and also, crucially, the smaller ranges set by the judicially imposed sentence." Liman, *supra*, at 1373. *See Artez v. Mulcrone*, 673 F.2d 1169 (10th Cir.1982); *Moore v. Nelson*, 611 F.2d 434 (2d Cir. 1979). The Supreme Court, however, has considered the constitutional stature of the parole process generally, and has concluded:

> That the [government] holds out the *possibility* of parole provides no more than a mere hope that the benefit will be obtained. To that extent the general interest asserted here is no more substantial than the inmate's hope that he will not be transferred to another prison, a hope which is not protected by due process.

*Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 11, 99 S.Ct. 2100, 2105, 60 L.Ed.2d 668 (1979) (citation omitted) (emphasis in original). The Court also emphasized that "[t]here is a crucial distinction between being deprived of a liberty interest one has, as in parole [revocation], and being denied a conditional liberty that one desires," as in parole release. *Id.* at 9, 99 S.Ct. at 2105.

Through oversight of administrative agencies, the executive branch also plays a role in the criminal justice system because such agencies promulgate rules, the violation of which Congress has declared to be a crime. In *United States v. Grimaud*, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911), the Supreme Court considered the constitutionality of a delegation by Congress to the Secretary of Agriculture to promulgate rules. Congress had provided that a violation of these rules would be a crime even before they were promulgated. In upholding this delegation, the Court determined that "[t]he Secretary did not exercise the legislative power of declaring the penalty or fixing the punishment ..., but the punishment is imposed by the act itself. The offense is ... 'contrary to the laws of the United States....'" *Id.* at 523, 31 S.Ct. at 485. Thus, Congress may delegate to an administrative agency the power to enunciate rules and regulations, but Congress alone may declare that a violation of a rule or regulation is a crime and fix a penalty for such a violation. *See Avent v. United States*, 266 U.S. 127, 45 S.Ct. 34, 69 L.Ed. 202 (1924).

Second, the judicial branch plays a central role in the criminal justice process because it adjudicates guilt or innocence and, once a person is found guilty, imposes a sentence within congressionally prescribed limits, and because it promulgates procedural and evidentiary rules to regulate practice in federal courts. The grant of discretion in sentencing to the judiciary, to our knowledge, has never been challenged as unconstitutional. Although "the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative," *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976), this practice has deep jurisprudential roots. The colonial criminal codes, for example, often gave the magistrate a measure of discretion concerning the duration of an offender's stay in the stocks or in the pillary.[7] The same

---

**7.** The Duke of Yorke's Laws of 1676, in force in    Pennsylvania, provided that

discretion was accorded judges shortly after the Constitution was ratified.[8]

█ Although the judiciary typically exercises discretion in imposing a sentence, Congress may severely limit or, possibly, even eliminate this discretion altogether, except in capital cases. *See Lockett v. Ohio*, 438 U.S. 586, 603, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) ("legislatures remain free to decide how much discretion in sentencing should be reposed in the judge or jury in noncapital cases"); *Marshall v. United States*, 414 U.S. 417, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974) (upholding congressional preclusion of a rehabilitative sentencing option). Indeed, although judges exercised some discretion in sentencing "[i]n the early days of the Republic, ... the period of incarceration was generally prescribed with specificity by the legislature." *Grayson*, 438 U.S. at 45, 98 S.Ct. at 2613.

Through the promulgation of procedural and evidentiary rules, the judicial branch regulates practice in federal courts. In *Sibbach v. Wilson & Co.*, 312 U.S. 1, 9–10, 61 S.Ct. 422, 424, 85 L.Ed. 479 (1940), which involved a challenge to provisions of the Federal Rules of Civil Procedure, the Supreme Court acknowledged that "Congress has undoubted power to regulate the practice and procedure of federal courts, and may exercise that power by delegating to the federal courts authority to make rules not inconsistent with the statutes or Constitution of the United States." *See Wayman*, 23 U.S. (10 Wheat.) at 43. These rules have been upheld on the ground that they are procedural, not substantive, in nature. *See* Rules Enabling Act of 1934, 28

U.S.C. § 2072 (Procedural rules promulgated by the judiciary "shall not abridge, enlarge, or modify any substantive right").

In considering whether Congress, through the Sentencing Act, has violated the nondelegation doctrine by granting the Commission the authority to exercise a nondelegable legislative function, we return to the concept of a delegation continuum enunciated earlier. We first note that Congress' delegation to the Commission to promulgate the Guidelines plainly is distinct from a congressional delegation to an administrative agency to regulate economic activity. The Supreme Court liberally has upheld economic regulations to accommodate Congress' desire to address significant social concerns by creating, an administrative bureaucracy. In our view, however, the property interests implicated in such regulations, which fall at one end of the delegation continuum, are readily distinguishable from the liberty interest implicated in being incarcerated or subject to other criminal sanctions. Thus, the question becomes whether Congress' delegation to the Commission falls in the middle of the continuum as a permissible delegation for which specific Congressional intent is required, or at the far end of the continuum as an impermissible delegation of legislative authority.

We next observe that the Commission's work is unlike that of the executive branch in making parole decisions and in overseeing administrative rulemaking and that of the judicial branch in promulgating procedural rules. First, the Sentencing Commission's promulgation of the Guidelines differs fundamentally from the Parole Com-

---

[i]f any person whatsoever shall kindle any fire in the woods or Grounds lying in Common, ... he shall be Lyable to pay all Damage; of whatsoever Sort, and half so much more for a fine; or if not able to pay the Court shall Adjudge the person guilty of Corporal punishment *not exceeding twenty Stripes, or do Service to to Expiate the Crime. Reprinted in Fair and Certain Punishment, Report of the Twentieth Century Task Force on Criminal Sentencing* 133 n. 2 (1976) (emphasis added) [hereinafter *Task Force Report* ]. Similarily, the Province Laws of 1750, in force in Massachusetts, provided that

where there shall appear any circumstances to mitigate or alleviate any of the offenses against this act, in the judgment of the court before which such offense shall be tried, it shall and may be lawful for the judges of such court to *abate the whole of the punishment of whipping or such part thereof as they shall judge proper.*
*Id.* at 134 n. 5 (emphasis added).

**8.** The Massachusetts "maiming" statute of 1804, for example, directed judges to adjust their punishments "according to the nature and aggravation of the offense." *Task Force Report, supra,* at 134 n. 6.

mission's decisions to release persons from incarceration because the possibility of such release gives rise to no liberty interest whereas, in our view, the Guidelines do implicate such an interest. In addition, because the Parole Commission can only shorten, not lengthen, a person's sentence, its decisions cannot be said to deprive a person of a liberty interest. Second, the Guidelines are substantively different from ordinary administrative rules, the violation of which Congress has declared a crime, and the punishment for which Congress has fixed a penalty. Indeed, in promulgating binding Guidelines, the Commission is performing exactly the function of fixing penalties that the Supreme Court repeatedly has stated agencies are prohibited from doing. Third, the Guidelines are dissimilar to the procedural rules promulgated by the judicial branch because the Guidelines are substantive in nature. They directly affect the sentence imposed by a sentencing court, and judges may not depart from the Guidelines sentencing range except in unusual circumstances. We find that Congress' delegation to the executive branch of the authority to make parole decisions and to promulgate administrative rules, and to the judicial branch to promulgate procedural rules, properly is characterized as falling in the middle of the continuum as a permissible delegation of Congress' legislative authority.

We further note that the Commission's activities in promulgating the Guidelines are distinct, on constitutional grounds, from the executive branch's exercise of discretion in prosecuting cases and the judicial branch's exercise of discretion in making sentencing decisions. Both of these powers are affected by Congress' lawmaking function, but unlike Congress' delegation to the Commission to exercise discretion in formulating the Guidelines, the executive's prosecutorial decisions and the judiciary's sentencing decisions are founded on these branches' inherent constitutional authority. Thus, although the exercise of this inherent constitutional discretion by the executive branch and the judicial branch can and typically does significantly affect the sentence a defendant ultimately receives, Congress' delegation to the Commission cannot be justified by comparison to these functions.

Finally, we observe that the Framers of the Constitution, in allocating all legislative powers to Congress, expected Congress, as a body of elected representatives, to assume primary responsibility for the formulation of policy. This is true particularly in areas that impinge on personal liberties. Judging by its work product, the Commission made literally thousands of policy choices in formulating the Guidelines. Included among these policy decisions are determinations pertaining to such important issues as the status of plea bargaining, the extent to which cooperation with law enforcement authorities should be rewarded, when probation should be allowed, the circumstances under which monetary fines should be imposed, and the appropriateness of community service. These choices profoundly influence every citizen's liberty. They also reflect such factors as society's intolerance for the drug traffic in this country, the appropriate response to the violent climate in some of our nation's localities, and the rise and fall of various categories of white collar crime. In our view, the fixing of criminal penalties requires a legislative policy determination and direct Congressional action. The determination of the comparative societal egregiousness of one crime as opposed to another would seem to be one of the most important functions committed to the legislative branch. Congressional delegation of this function to the Commission disrupts the proper balance between the coordinate branches and permits the Congress to evade its constitutionally assigned role as chief policy maker.

■ Based on the foregoing, we hold that the promulgation of Sentencing Guidelines that are binding on the federal courts is a nondelegable legislative function. As a result, we need not decide whether the Act provides the requisite intelligible principle. Congress, consistent with the Constitution, may not entrust the power of fixing the punishment for crimes to an independent agency such as the Sentencing

Commission. This function is one that must be performed by legislators elected by and accountable to the people.

If we are ever to reshoulder the burden of ensuring that Congress itself makes the critical policy decisions, [this is] surely the [case] in which to do it.... It is the hard choices, and not the filling in of the blanks, which must be made by the elected representatives of the people. When fundamental policy decisions underlying important legislation about to be enacted are to be made, the buck stops with Congress and the President insofar as he exercises his constitutional role in the legislative process.

*Industrial Union Department v. American Petroleum Institute,* 448 U.S. 607, 687, 100 S.Ct. 2844, 2887, 65 L.Ed.2d 1010 (1980) (Rehnquist, J., concurring). Congress alone has the power, subject to the veto authority of the President, to declare certain actions to be crimes; it alone also has the obligation to fix criminal penalties such as those contained in the Guidelines.

That Congress, not the Commission, actually made the Guidelines the law of the land by failing to take action on them during the six month period following the Commission's submission of the Guidelines to Congress, does not affect our determination that Congress' delegation was unconstitutional. Congress no doubt has the authority to enact the Guidelines, but it must do so through direct legislative action. Congress may not create or modify substantive criminal sanctions through inaction. As the Supreme Court stated in *Greene,* 360 U.S. at 507, 79 S.Ct. at 1419, "Such decisions cannot be assumed by acquiescence or non-action."

In sum, we hereby DECLARE the Sentencing Guidelines to be unconstitutional and unenforceable on the ground that they were promulgated by a body to which Congress, consistent with the Constitution, could not delegate such a function.

## VI

### SEVERABILITY

■ Having determined that the promulgation of the Sentencing Guidelines are unconstitutional, the Court now must determine whether the remaining provisions of the Sentencing Act may be severed from those found to be constitutionally objectionable. Because a ruling of unconstitutionality frustrates the intent of the elected representatives of the people, the Supreme Court has mandated that

a court should refrain from invalidating more of the statute than is necessary.... "[W]henever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid."

*Regan v. Time, Inc.,* 468 U.S. 641, 652, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984) (plurality opinion) (quoting *El Paso & Northeastern Ry. v. Gutierrez,* 215 U.S. 87, 96, 30 S.Ct. 21, 24, 54 L.Ed. 106 (1909)). Whether an unconstitutional provision can be severed from the remainder of a statute turns largely on the question of congressional intent, with the presumption being in favor of severability. *Regan,* 468 U.S. at 653, 104 S.Ct. at 3269. Under the Supreme Court's well established standard, "Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 107 S.Ct. 1476, 1480, 94 L.Ed. 2d 661 (1987) (citations omitted).

The question is not simply whether the remaining unobjectionable provisions are capable of functioning independently of the unconstitutional provisions. Rather, "[t]he more relevant inquiry is whether the statute will function in a *manner* consistent with the intent of Congress." *Id.* at 1481 (emphasis in original). Thus, the fact that the remaining provisions could continue to be operative standing alone is less relevant than the determination of whether they would continue to function as Congress intended.

Applying this standard to the instant case, the Court first notes that the mere

fact that the Act contains no severability clause does not, by itself, raise a presumption against severability. *Id.* ("In the absence of a severability clause, ... Congress' silence is just that—silence"). Looking to the language of the Act, the Court finds persuasive on this issue the analysis in *United States v. Estrada,* 680 F.Supp. 1312 (D.Minn.1988), in which the court noted that severing the remaining unobjectionable provisions would continue to advance important purposes and goals of sentencing reform. Among the changes that the court determined could be preserved by severing the guidelines provisions were:

1) a specific and detailed set of statutory standards and purposes for sentencing that narrow the judge's discretion, *see, e.g.,* 18 U.S.C. § 3553(a)(2);

2) the requirement of "real time" sentences, *see id.* at § 3624(a)–(b), and the elimination of parole, Sentencing Act, §§ 218(a)(5), 235, 98 Stat. 2027, 2031–34;

3) the requirement that judges state reasons for imposing particular sentences, thus opening the process to public scrutiny, *see* 18 U.S.C. § 3553(c);

4) the prohibition of probation for certain types of offenses, *see id.* at §§ 3561–68; and

5) the appellate review of sentences, *see id.* at § 3742.

Looking to the Act's legislative history, the Court finds considerable evidence of Congress' intent that as much of the sentencing reform legislation as is not unconstitutional should remain in operation. Congress intended that the Act create "the first comprehensive sentencing law for the Federal System," S.Rep., *supra,* at 37, U.S. C.C.A.N. at 3220. In enacting this legislation, Congress had determined that "[t]he lack of reasonable consistency in the sentences handed down by the courts is due in large part to the lack of comprehensive Federal sentencing law." *Id.* at 49, U.S.C. C.A.N. at 3232. Congress concluded that the "sweeping provisions" of the Act represent "a major breakthrough" in sentencing reform. *Id.* at 65, U.S.C.C.A.N. at 3248.

One congressman stated that the Act's intended effect is to "rewrite the face of sentencing in this country as we know it, and have known it for over 200 years." 133 Cong.Rec. H8112 (Rep. Synar) (Oct. 5, 1987). *See also id.* at H8107 (the Guidelines are intended to effect "the most dramatic change in our Nation's history" in the Federal criminal justice system) (Rep. Conyers); *id.* at H8109 (the Act "culminated over a decade of effort to overhaul" the federal sentencing system) (reprint of letter from Attorney General Meese to Rep. Lungren, Oct. 2, 1987).

▆ The foregoing statements indicate to this Court the strong will of Congress to reform the federal law of sentencing. Having given due consideration to the history and language of the Act, the Court determines that it is not evident that Congress would have refrained from enacting the remaining provisions independently of the Guidelines. Thus, because the presumption recently restated in *Alaska Airlines* favoring severability has not been overcome, the Court DECLARES that, unlike the provisions concerning the Guidelines, the remaining provisions, whose constitutionality has not been challenged in this case, remain operative as to sentences yet to be imposed.[9]

## VII

### RELIEF

The Court, having determined that the Guidelines are unconstitutional, but that the Act's remaining provisions are operative, now must address the final question of how to proceed, as a practical matter, with the imposition of sentences. The Court notes that other panels facing the issue have taken different tacks.

For example, in *United States v. Brodie,* 684 F.Supp. 634 (D.Idaho 1988), the court,

---

9. The court in *United States v. Allen,* 685 F.Supp. 827 (N.D.Ala.1988) reading the same legislative history, found that it "reflects an ambivalent congressional intent" on the question of severability. Even if that conclusion were correct, in our view the presumption favoring severability nevertheless would control.

having found the Guidelines to be unconstitutional, nonetheless "stay[ed] the effect of its ruling until the constitutionality of the Sentencing Act has been finally decided." *See also United States v. Bolding,* 683 F.Supp. 1003 (D.Md.1988). This Court chooses not to follow that course. Having ruled that the Guidelines are unconstitutional, the Court can find no reason to proceed, in effect, as if it had found to the contrary.

Alternatively, in *United States v. Martinez–Ortega,* 684 F.Supp. 634 (D.Idaho 1988), the court, after finding that the Guidelines are constitutionally flawed, chose to sentence defendants under both the Guidelines and the pre-existing law. Again, having found the Guidelines to be inoperative, this Court finds that such fence straddling is not only unnecessary, but also presents potential due process problems that must be avoided. The Court, for example, can foresee a scenario under this approach in which a defendant who has received alternative sentences could argue that the sentence arrived at under pre-existing law was unavoidably tainted by the Court's contemporaneous consideration of the unconstitutional Guideline factors. Further, the Supreme Court often has indicated that "vague sentencing provisions may [pose] constitutional questions if they do not state with sufficient clarity the consequences of violating a given criminal statute." *United States v. Batchelder,* 442 U.S. 114, 123, 99 S.Ct. 2198, 2204, 60 L.Ed.2d 755 (1978) (citations omitted). Because sentencing under both the Guidelines and pre-existing law arguably may present such a case of objectionable vagueness, the Court chooses to reject this approach, thus avoiding its potential problems.

■ Having reviewed the cases that have addressed this dilemma, the Court finds that the best approach is to act consistently with its substantive determination that the Guidelines are unconstitutional and inoperative, but that the Act's other provisions remain in effect. Thus, the Court DECLARES that hereafter it will sentence defendants for crimes committed on or after November 1, 1987, under the pre-existing law without regard to the Guidelines, but that such sentences shall be determined in accordance with the dictates of the remaining provisions of the Act, including those set out above concerning the requirement of "real time" sentences, the elimination of parole, and the requirement that judges state their reasons for imposing particular sentences.

## VIII

### SUMMARY

Pending before the Court is defendants' motion for an order declaring that the Sentencing Guidelines promulgated by the Sentencing Commission are invalid and unenforceable. Defendants have asserted a variety of grounds for this motion, but the Court addresses only the issue of whether Congress' delegation of authority to the Commission was unconstitutional under the nondelegation doctrine. This doctrine provides that Congress, consistent with the Constitution, may not delegate certain legislative functions. In applying this doctrine to the instant case, we find that fixing criminal penalties for the violation of federal criminal statutes is so essential to the preservation of our constitutional liberties that it requires a legislative policy determination and direct congressional action. Congress alone can enact sentencing guidelines through direct legislative action. Accordingly, we hereby DECLARE the Sentencing Guidelines to be unconstitutional and unenforceable on the ground that they were promulgated by a body to which Congress, consistent with the Constitution, could not delegate such a function.

The Court, although determining that the Sentencing Guidelines are unconstitutional, nevertheless DECLARES that other substantive changes in the criminal justice system that were enacted directly by Congress in the Sentencing Act may be SEVERED from the unconstitutional provisions concerning the Guidelines. Thus, in sentencing defendants for crimes committed on or after November 1, 1987, we will consider

**56**

the standards and purposes for sentencing as articulated by Congress in imposing individualized sentences, we will not impose probation for certain types of offenses, we will impose "real time" sentences, and we will state our reasons for imposing a particular sentence on the record.

An Order will be entered simultaneously with this Memorandum.

### ORDER

In accordance with the contemporaneously entered Memorandum, we, the United States District Court Judges for the Middle District of Tennessee, sitting en banc, hereby FIND as follows:

(1) The Sentencing Guidelines promulgated by the Sentencing Commission are hereby DECLARED to be unconstitutional and unenforceable.

(2) The provisions of the Sentencing Act pertaining to the Sentencing Guidelines are hereby SEVERED from all remaining provisions of the Act, which shall remain valid and fully enforceable.

IT IS SO ORDERED.