**UNITED STATES of America, Plaintiff,**

v.

**Paul Richard RUSSELL, et al., Defendants.**

**Crim. A. No. 1:88–CR–7–MHS.**

United States District Court,
N.D. Georgia,
Atlanta Division.

April 29, 1988.

**1246**

Michael Kessler, Atlanta, Ga., for defendant Russell.

Carlos D. Sans, Public Defender's Office, Atlanta, Ga., for defendant Ramey.

Janis Gordon, Asst. U.S. Atty., Atlanta, Ga., for U.S.

## ORDER

SHOOB, District Judge.

### INTRODUCTION

Defendants Leslie Robert Ramey and Paul Richard Russell were charged in a three count indictment with robbing a bank on December 21, 1987, using a firearm during the bank robbery, and conspiring to rob the bank. Defendant Ramey was tried and convicted by the jury on all charges. Defendant Russell pled guilty to two counts of the indictment and the third count was dropped. Nothing remains to be done in this case but to impose sentence.

Because defendants' offenses occurred after November 1, 1987, defendants are now subject to being sentenced under the sentencing guidelines issued by the United States Sentencing Commission ("Commission") pursuant to the Sentencing Reform Act of 1984 ("Act"), 28 U.S.C. §§ 991–998. Both defendants move the Court to preclude application of the sentencing guidelines to their case on constitutional grounds.

They assert that the Act is unconstitutional because (1) it embodies an unconstitutional delegation of Congress' power to determine criminal sanctions; and (2) it violates separation of powers principles by conferring quasi-legislative power on federal judges, by giving the President removal power over the Commissioners, and by re-

quiring federal judges to serve on the Commission. Defendants further contend that the guidelines promulgated by the Commission are void because they do not comply with the mandate of the enabling legislation.

The Court has considered the issues carefully and soberly, well aware of the huge number of work hours and resources that have been expended in producing the Act and the guidelines. For the reasons stated below, the Court finds that the Act is unconstitutional and that the guidelines cannot be employed.

Several district courts have recently faced similar challenges to the guidelines and have set forth the history and purpose of the Act in great detail. *See*, e.g., *United States v. Arnold*, 678 F.Supp. 1463 (S.D. Ca.1988); *United States v. Ruiz–Villanueva*, 680 F.Supp. 1411 (S.D.Ca.1988). This Court will therefore dispense with discussing the background of the Act and will deal immediately with defendants' constitutional arguments.

## I. *Non–Delegation Doctrine*

Defendants here assert that the sentencing guidelines were promulgated pursuant to an unconstitutional delegation of power by Congress. Defendants invoke the long-dormant "non-delegation" doctrine. They argue first that Congress may never delegate its power to determine criminal sanctions; and, second, even if it may, that Congress has not sufficiently articulated its policy choices or defined the scope of the delegated authority.

Under the Act the task assigned to the Commission is to promulgate binding guidelines that virtually mandate that a judge impose a specified sentence within a narrowly circumscribed range. Defendants maintain that the process of determining the range of available criminal penalties is so fraught with ethical and moral questions and policy determinations that it is a task that cannot constitutionally be delegated to a commission that is not elected and is insulated from public scrutiny. This position has some support in recent case law,[1] but has never obtained a majority. The Supreme Court has invalidated a statute as an undue delegation of legislative power only twice. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). In each of these cases the Supreme Court found the legislative act invalid because it did not set forth intelligible principles to guide the exercise of the authority delegated. Otherwise the Supreme Court has consistently upheld Congress' power to delegate. *See Synar v. United States*, 626 F.Supp. 1374, 1383–84 (D.D.C.), *aff'd on other grounds sub nom., Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed. 2d 583 (1986). It has not found that some functions of Congress are so fundamental that they may not be delegated. *See id.* at 1385 (rejecting "core function" analysis of legislative delegation issues). Thus, although "intelligible principle" analysis leaves many aspects of legislative delegation unexplored,[2] this Court will not generate a new method of analyzing delegation issues.

Moreover, the Court will not engage in a lengthy discussion of the application of the existing analysis to this Act because several courts have recently done so. *See*, e.g., *Arnold, supra*, at 1466–69; *Ruiz–*

---

1. *See Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 3194, 92 L.Ed.2d 583 (1986) (J. Stevens, concurring) "... when Congress, or a component or agent of Congress, seeks to make policy that will bind the Nation, it must follow the procedures mandated by Article I of the Constitution—through passage by both Houses and presentment to the President. In short, Congress may not exercise its fundamental power to formulate national policy by delegating that power to one of its two Houses, to a legislative committee, or to an individual agent ..."

2. For example, the analysis does not take into account the nature of the rights affected by the exercise of the authority delegated or the extent of the shift in power from the legislative to the executive branch of government. Perhaps where Congress delegates power that results in a substantial shift in the balance of power or that requires the agency to make decisions affecting fundamental rights, some heightened level of scrutiny might be appropriate.

*Villanueva, supra,* at 1415–17. Simply stated, the Court has reviewed and compared delegations previously adjudicated and concludes that the Act contains ample "intelligible principles" to orient the Commission.

## II. *Separation of Powers Issues*

Constitutional separation of powers is so fundamental to our governmental system that every school child learns about our system of checks and balances. The division of power among three branches was effected by the Framers to prevent concentration of too much power in too few hands, or, in other words, to "diffus[e] power the better to secure liberty." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). The Constitution bestows distinct authority on each of three departments of government and gives each branch limited powers over the others.

> The Framers provided a vigorous legislative branch and a separate and wholly independent executive branch, with each branch ultimately responsible to the people. The Framers also provided for a judicial branch equally independent with "[t]he judicial Power ... extend[ing] to all Cases in Law and Equity, arising under this Constitution, and the Laws of the United States." Art. III, § 2.

*Bowsher,* 106 S.Ct. at 3186.

The principle of separation of powers may be violated when one branch interferes impermissibly with another's performance of its constitutionally assigned function, or when one branch assumes a function that is entrusted to another. *INS v. Chadha,* 462 U.S. 919, 963, 103 S.Ct. 2764, 2790, 77 L.Ed.2d 317 (1983) (Powell, J. concurring in judgment). *See also In re Sealed Case,* 838 F.2d 476, 511 (D.C.Cir. 1988). One branch cannot expand its power even if the expansion is authorized by another branch. *See Buckley v. Valeo,* 424 U.S. 1, 123, 96 S.Ct. 612, 684, 46 L.Ed.2d 659 (1975). Defendants argue convincingly here that several aspects of the Act violate the separation of powers doctrine. Specifi-

cally, they argue that (1) the placement of the Commission in the judiciary; (2) the requirement that Article III judges serve on the Commission; and (3) the vesting in the President of appointment and removal power over the commissioners, are all unconstitutional.

Much has been written recently about the constitutional ramifications of placing the Commission in the judiciary. In this district, Judge Tidwell found that the existence of the President's power to remove commissioners establishes the Commission as an executive rather than judicial agency. *United States v. Erves,* No. CR 87–478A (N.D.Ga. March 22, 1988). Judge Brewster of the Southern District of California found that the duties and powers of the Commission—interpreting, monitoring and enforcing the mandate of the statute as laid out by Congress—constitute executive function that cannot be constitutionally assigned to the judiciary. *Arnold, supra,* at 1469; *Accord United States v. Tolbert,* 682 F.Supp. 1517, (D.Kan.1988). On the other hand, Judge Enright of the Southern District of California decided that the task of the Commission is properly placed in the judicial branch because it acts in aid of the "primarily judicial" function of sentencing. *Ruiz-Villanueva, supra,* at 1422. Because these decisions discuss this issue at great length, this Court will state its view of the placement of the Commission only summarily.

■ The Act establishes a Commission in the judicial branch whose primary duty is to promulgate guidelines to be used in sentencing criminal defendants. *See* 28 U.S.C. § 991(a). Although some non-adjudicatory rule making has been held to be compatible with the Constitutional mandate that Article III judges restrict their activities to cases and controversies, *see Sibbach v. Wilson & Co.,* 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941), the power bestowed on this Commission falls outside of the scope of the judicial function. The sentencing guidelines are not simply guideposts to aid the exercise of judicial discretion. The federal sentencing guidelines, like the Florida guidelines challenged in *Miller v. Florida,*

— U.S. ——, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987), are substantive rules that place rigid restrictions on the discretion of the sentencing judge. They reduce the role of the sentencing judge to filling in the blanks and applying a rigid, mechanical formula. Thus, in promulgating the guidelines the Commission does not act simply "in aid of the judicial function." It acts in place of the judge. In this way, the Commission is distinct from the other rule making bodies within the judicial branch, such as the Judicial Conference, the Advisory Committee on the Federal Rules of Civil Procedure, the federal probation service and the Administrative Office of the United States Courts. *See Sibbach*, 312 U.S. at 14, 61 S.Ct. at 426. In promulgating binding guidelines outside of the context of a case or controversy, the Commission is fleshing out the details of a statutory scheme to implement the legislative mandate. That task is "the very essence of 'execution of the law.'" *Bowsher*, 106 S.Ct. at 3192. Moreover, unlike the other judicial branch agencies, whose members are appointed and controlled by Article III judges, the Commission's members are appointed and may be removed by the President. For all of these reasons, this Court concludes that the power of the Commission is not properly in aid of the judicial function. *See Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 876 (1977). Its power is quasi-legislative. Its composition gives it an executive character. The power to set prescriptive, mandatory sentencing rules is not confided in the judiciary by the Constitution. It is therefore a power that the federal courts must "'carefully abstain from exercising.'" *Muskrat v. United States*, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911) (citation omitted).

The Department of Justice "concedes" in its brief that the Commission is unconstitutionally placed in the judiciary, but argues that the portion of the Act that places the Commission can simply be severed, leaving the Commission an executive agency. It is evident that this "concession" represents no great sacrifice by the Department of Justice. If the Court were to take the action urged, the executive branch would virtually complete its already expansive power over the criminal justice system. The tasks of the executive branch would then include not only its traditional functions of investigating, charging, and prosecuting, but also determining sentence and reviewing petitions for modification of sentence. *See* 28 U.S.C. § 994(s).

Even so, the Court would sever that portion of the Act rather than find the entire statute unconstitutional, if severance could be accomplished without doing violence to the legislative intent. *See Alaska Airlines, Inc. v. Brock*, —— U.S. ——, 107 S.Ct. 1476, 94 L.Ed.2d 671 (1987). Unfortunately, it cannot. The legislative history of the Act reveals that "[p]lacement of the Commission in the judicial branch [was] based upon the Committee's strong feeling that, even under this legislation, sentencing should remain primarily a judicial function." S. Rep. No. 225 at 159, *reprinted in* 1984 U.S. Code Cong. & Admin. News at 3182, 3342. A House report commenting on an earlier version of the legislation expressed doubts about whether placing an agency to promulgate sentencing guidelines in the executive branch would violate separation of powers principles. *See* H.R. 96–1396, 96th Cong., 2d Sess. (1980). The report noted that assignment to the executive branch would alter the relationship between Congress and the judiciary regarding sentencing. *Id.* at 489, 490; *see also* H.R.Rep. No. 98–1017, 98th Cong., 2d Sess. 105–108 (1984). This Court cannot say whether the legislature would have willingly passed the power to set mandatory sentencing rules to the executive or would have instead undertaken the task itself, set up an advisory body entirely under the control of the judiciary, or decided on some other option. The Court will therefore decline to sever the portion of the Act that places the Commission in the judiciary and will leave the job of rewriting the Act to Congress.

Even if the Court were to find that the designating language could be severed, the composition of the Commission would still render it unconstitutional. Judicial membership on the Commission violates the doc-

trine of separation of powers, regardless of where the Commission is located.

Judges have often held non-judicial offices or served on presidential commissions while maintaining their positions as Article III judges. For instance, John Jay served simultaneously as Chief Justice and Ambassador to England, and Chief Justice Earl Warren presided over the commission that investigated President Kennedy's assassination. *See* Liman, *The Constitutional Infirmities of the Sentencing Act,* 96 Yale L.J. 1363 at 1382 nn. 137–38. Throughout the history of the federal government, however, the practice of serving simultaneously in the judicial and executive branch has been criticized. Ackerman, *Separation of Powers and Judicial Service on Presidential Commissions,* 53 U.Chi.L.Rev. 993, 998 (1986). Perhaps because such service rarely gives any individual standing to challenge a particular commission's membership, the practice has remained largely unchallenged in the federal courts. Recently, however, the Eleventh Circuit held that service by a federal judge on the President's Commission on Organized Crime violated the doctrine of separation of powers. *In re Application of President's Commission on Organized Crime Subpoena of Scaduto,* 763 F.2d 1191 (11th Cir.1985); *cf. Matter of President's Commission on Organized Crime Subpoena of Scarfo,* 783 F.2d 370 (3rd Cir.1986). The court employed an "impairment of function" test. Under this test the service of a federal judge on a presidential commission violates the separation of powers doctrine if it holds the potential for impairing the function of the judicial branch and the President has no overriding interest in the appointment. *Scaduto,* 763 F.2d at 1195–1197. *See also Nixon, supra.* The Eleventh Circuit held that judicial impartiality was threatened by service on the commission at issue in that case because that commission was charged with assisting and improving enforcement efforts against organized crime. The activities of that commission required or could be perceived publicly as requiring the judge to adopt a progovernment perspective. In contrast, in *Scarfo* the Third Circuit focused on the voluntary nature of service on the commission and determined that judicial membership on the commission did not prevent the commission from carrying out its duties or disrupt the operation of the courts.

The Third Circuit's emphasis on the voluntary nature of service on these commissions is worthy of comment. It has long been understood that the separation of powers doctrine may be violated merely by the expansion of power by one branch, even where that expansion does not impair another branch's function. *See INS v. Chadha,* 462 U.S. at 963, 103 S.Ct. at 2790; *Nixon,* 433 U.S. at 514, 97 S.Ct. at 2826. For this reason, the courts have traditionally resisted enlargement of the judiciary's powers. *See, e.g., United States v. Ferreira,* 54 U.S. (13 How.) 40, 52, 14 L.Ed. 42 (1851); *Hayburn's Case,* 2 U.S. (2 Dall.) 409, 412, 1 L.Ed. 436 (1792); *In re Sealed Case,* 838 F.2d at 517; *Hobson v. Hansen,* 265 F.Supp. 902 (D. D.C. 1967). In *Hayburn's Case,* the Supreme Court stated "[t]hat neither the legislative nor executive branches, can constitutionally assign to the judiciary any duties, but such as are properly judicial and performed in a judicial manner." [3] *Hayburn's Case,* 2 U.S. at 409. In this Act Congress has certainly imposed extra-judicial duties on the courts. Judges' service on the Commission must be characterized as "required" rather than "voluntary," as the Department of Justice argues, because the Act mandates the appointment and participation of three Article III judges.[4] It obliges the Judicial Conference to recommend six judges for appointment

---

**3.** As discussed above, assignments of duties that aid the judicial function have been upheld as non-violative of the separation of powers doctrine. *See Sibbach, supra.*

**4.** Undoubtedly, the three judges who accepted appointments on the Commission did so of their, own free will. This fact is of no significance in a nation that has abolished involuntary servi-

tude. Moreover, the positions are not voluntary in the sense of unpaid or "volunteer" positions. The judges on the Commission serve full time, are relieved of their duty to reside in their Circuit, yet still draw their full judicial salary and may, in fact, receive a raise. *See* 28 U.S.C. §§ 992(a), 992(c).

and compels the judiciary to surrender the service of three of its members. 28 U.S.C. § 991(a). The bottom line is that without the judges, the Commission can not exist. In this way, this Commission is distinguished from the one at issue in *Scarfo*.

By requiring service of Article III judges on the Commission and having the judges participate in writing the very law that they are expected to exercise, Congress has not only expanded the power of the judiciary beyond its constitutionally assigned tasks of deciding cases and controversies (see discussion above), but has also "threatened the very existence of the Judicial Branch—its actual and apparent impartiality and independence." *Arnold, supra* at 1472.

Further, the existence of appointment and removal power in the President also impairs the apparent impartiality of the judiciary. Under the Act, the Commissioners wield substantial power over the judiciary and the criminal justice system. The Commission deals with highly controversial topics and may place Commissioners in the public spotlight. Moreover, their difficult and controversial decisions must be approved by at least one of the four politically appointed Commissioners who are not Article III judges if they are to carry the day.[5] These facts may not only threaten the appearance of impartiality of current Commissioners, but may set up a temptation for those who are hopeful of obtaining an appointment to the Commission in the future. The positions may come to be seen as "plums" or as an *entre* to other positions in the executive or to a position on the Supreme Court. The dual power of the President to appoint and remove federal judges from such positions certainly establishes an incentive to curry the favor of the executive and erodes the independence and impartiality of the judiciary.[6]

Other ways in which the Act impairs the function of the judiciary are more obvious, though less far-reaching. The Act provides no replacement for the three judges who must serve full time on the Commission. Their function as judges is completely impaired while they serve their term. The other judges in their district or circuit must either pick up the slack or allow cases to remain stymied on the docket. These problems will continue after the term of each Commissioner expires, because these judges will almost certainly have to recuse themselves from consideration of future criminal cases involving sentencing issues. *Scaduto* makes clear that the impairment of function of an individual judge is sufficient to violate the separation of powers doctrine and to invalidate that judge's service on a commission. *See Scaduto*, 763 F.2d at 1196–1197. It is obvious then that service on this Commission cannot pass the impairment of function test. What could be more impairing of the individual judge's judicial function than to take the judge completely out of service?

Thus, this Court concludes that the Act substantially impairs the function of the judiciary. The Court further finds that there exists no overriding need to require Article III judges to sit on the Commission. Former judges, criminal lawyers or sentencing experts could serve equally well. Or, judges could have been invited to consult with or advise the Commission. In sum, mandatory service of Article III judges on the Commission violates the doctrine of separation of powers.

### III. *Application of the Sentencing Guidelines*

 Having concluded that the Commission is unconstitutionally composed and unconstitutionally placed in the judiciary, the Court must next consider whether the guidelines or any portion of the Act can be applied in sentencing the defendants now before the Court. In *United States v. Estrada*, 680 F.Supp. 1312 (D.Minn.1988), Judge Heaney decided that the sentencing guidelines could be severed from the Act

---

**5.** Each action of the Commission requires an affirmative vote of at least four Commissioners. 28 U.S.C. § 994(a).

**6.** The fact that a federal district judge would receive a raise of about $4,500 if appointed further tarnishes the public appearance of impartiality. *See* 28 U.S.C. §§ 992(a), 992(c).

and that the defendants could be sentenced in accordance with the basic principles set out in the legislation. In this Court's view, severance of the guidelines and the portion of the Act that creates the Commission effects such a radical change in the legislation that it becomes an entirely new bill. This Court would prefer to leave the task of rewriting the Act to Congress. In any event, the past acts of the Commission might be deemed valid if they could have been effected without the judge–Commissioners. *See Arnold, supra,* at 1472. Here, it is impossible to exclude the influence of the three judge-Commissioners from prior actions of the Commission. *Id.* The Court will therefore proceed to sentence defendants as if their crimes had occurred prior to November 1, 1987.

Finally, because the Court has decided to preclude application of the sentencing guidelines, it will not consider the various statutory challenges asserted by defendants.

In sum, the Court GRANTS defendants' motions to preclude application of the sentencing guidelines.