**UNITED STATES of America, Plaintiff,**

v.

**Addam W. SWAPP, Vickie L. Singer, Jonathan R. Swapp, John Timothy Singer, Defendants.**

**No. 88–CR–006J.**

United States District Court,
D. Utah C.D.

July 18, 1988.

Brent D. Ward, U.S. Atty., Salt Lake City, Utah, for plaintiff.

Grant W.P. Morrison, Salt Lake City, Utah, for defendant Addam W. Swapp.

Kathryn Collard, Salt Lake City, Utah, for defendant Vickie L. Singer.

J. Bruce Savage, Jr., Park City, Utah, for defendant Jonathan R. Swapp.

G. Fred Metos, Salt Lake City, Utah, for defendant and movant John Timothy Singer.

Donald A. Purdy, Jr. (John R. Steer with him on the brief), Washington, D.C., for amicus curiae U.S. Sentencing Com'n.

Jerome H. Mooney (Benson B. Weintraub with him on the brief), Salt Lake City, Utah, for amicus curiae Nat. Ass'n of Criminal Defense Lawyers.

Before JENKINS, C.J., WINDER, GREENE[1] and SAM, JJ., and ANDERSON, Senior District Judge.

1. The Honorable J. Thomas Greene, Jr., did not hear oral argument in this matter, but the parties agreed that he should participate in the court's decision. The issues were thoroughly briefed in the memoranda submitted.

## MEMORANDUM OPINION

JENKINS, Chief Judge:

The court, sitting en banc, holds that the Sentencing Reform Act of 1984, which establishes the mechanism by which the new Sentencing Guidelines applicable in this case were promulgated, is unconstitutional because it violates the separation and allocation of governmental powers mandated by the United States Constitution, because it constitutes an unlawful delegation of legislative authority and because it violates the procedural requirements of article I of the Constitution. The court will therefore not apply the guidelines in cases now pending before it.

### I.

The Sentencing Reform Act of 1984, Pub.L. No. 98–473, title II, §§ 211–39, 98 Stat.1987, was enacted as part of the Comprehensive Crime Control Act of 1984, Pub. L. No. 98–473, 98 Stat.1837, to remedy the inequities perceived by some persons allegedly resulting from the claimed disparate sentences given convicted criminals in federal court. The act creates the United States Sentencing Commission and designates it "an independent commission in the judicial branch of the United States." 28 U.S.C. § 991(a). The commission consists of seven voting members and one nonvoting member (the Attorney General or his designee). The President appoints the seven voting members with the advice and consent of the Senate.[2] Three of the seven members must be federal judges, selected from a list of six judges recommended by the Judicial Conference of the United States. Id. § 991(a). The federal judges

on the commission are not required to resign from the bench, but all commissioners serve full-time for the first six years, and the chairman of the commission serves full-time thereafter. Id. § 992(c). Commissioners may be reappointed to a second, six-year term. See id. § 992(b).

Members of the commission are "subject to removal ... by the President only for neglect of duty or malfeasance in office or for other good cause shown." Id. § 991(a).

The stated purpose of the commission is to "establish sentencing policies and practices for the Federal criminal justice system" and to "develop means of measuring the degree to which the sentencing, penal, and correctional practices are effective in meeting the purposes of sentencing," id. § 991(b), which are set forth in 18 U.S.C. § 3553(a)(2).[3]

The commission is charged with the responsibility of promulgating guidelines "for use of a sentencing court in determining the sentence to be imposed in a criminal case." 28 U.S.C. § 994(a). The guidelines are to establish a sentencing range "for each category of offense involving each category of defendant." Id. § 994(b)(1). The statute sets out factors for the Sentencing Commission to consider in establishing categories of offenses and categories of defendants, id. § 994(c) & (d), as well as factors the commission is not to consider, id. § 994(d), (e) & (k). In fulfilling its duties, the commission is instructed to consult with authorities on various aspects of the federal criminal justice system. Id. § 994(o).

Under the Sentencing Reform Act, for all federal crimes committed after November

---

**2.** The initial terms of the first members of the commission are staggered: Two members, including the chairman, serve six-year terms, three members serve four-year terms, and two serve two-year terms. All subsequent terms are for six years. 28 U.S.C. § 992(a).

**3.** Section 3553(a) states in pertinent part:
The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

. . . . .

(2) the need for the sentence imposed—
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner....

1, 1987, courts are required to impose sentences within the range established by the guidelines "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b) as amended by Sentencing Act of 1987, Pub.L. No. 100–182, § 3, 101 Stat. 1266, 1266.

A defendant may appeal his sentence if it is greater than the sentence specified in the applicable guideline, and the government may appeal a defendant's sentence if it is less than the sentence specified in the guideline. *Id.* § 3742.

If a defendant wants the guidelines modified in his case based on "changed circumstances unrelated to the defendant," the Sentencing Commission must approve his petition. 28 U.S.C. § 994(s).

## II.

This court is not the first to address the constitutionality of the Sentencing Reform Act. The issue has been hotly debated ever since the sentencing guidelines went into effect on November 1, 1987, and will continue to be debated until the Supreme Court decides the issue, hopefully in the fall.[4] By our tally, over fifty decisions have been rendered to date, with the cases running more than two to one against the constitutionality of the act. Thus, we are not writing on a clean slate. Nevertheless, we shall "indulge the conceit that something [we] may say might figure in the ultimate outcome." *United States v. Mendez,* 691 F.Supp. 656 (S.D.N.Y.1988).

■ We start with the proposition that questions of constitutionality do not turn on the court's idea of what constitutes prudent public policy. The most foolish statute in the world may still be constitutional. It is not for this court or any court to second-guess the wisdom of the policy deci-

sions of Congress or to read the court's own values into the Constitution so as to foreclose experimental solutions put forth by the legislature to difficult social problems.

"By the same token, the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution. Convenience and efficiency are not the primary objectives—or the hallmarks—of democratic government...." *INS v. Chadha,* 462 U.S. 919, 944, 103 S.Ct. 2764, 2780, 77 L.Ed. 2d 317 (1983). The only check on the legislative judgment (outside of the political process) is the Constitution. The legislature may not ignore constitutional limitations on its powers. If it does so, the court must vindicate the constitutional provision.

Perhaps the most important check on governmental power the Constitution provides is the separation of governmental powers into three branches, "the better to secure liberty," in Justice Jackson's famous phrase. *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).

■ Implicit in the fracturing of power into three great divisions is a recognition that the nature of the power exercised by each branch is different in make-up and purpose from the power exercised by other branches. The powers of each branch are peculiar to the function of that branch. Ordinarily, except for matters of money or structure, legislative power is concerned with matters of general application, matters of general policy of an embracive nature. Individual disputes of a fact-intensive nature involving specific persons or entities are ordinarily not the subject of legislative action. The legislature is peculiarly unfit as an institution to handle such fact-intensive matters concerned with the peculiarities of time, place and context.

*United States v. Mistretta,* —— U.S. ——, 108 S.Ct. 2818, 100 L.Ed.2d 920 (1988). The case will be argued during the October 1988 term.

**4.** The week of the hearing in this case, the Supreme Court granted certiorari before judgment in a case pending in the Eighth Circuit.

■ Judicial power, on the other hand, may be applied only to the decision of cases and controversies. U.S. Const. art. III, § 2.[5] The judiciary is peculiarly adept at dealing with fact-intensive controversies involving real disputes and rendering judgments dictated by the law and the facts. Although its decisions have precedential value, the judiciary is less adept at making policy decisions of general, prospective application.

Legislative power and judicial power are ordinarily applied at differing levels of abstraction, with the legislative power dealing with the general and the judicial power dealing with the concrete and fact specific. Congress is not well equipped to render individualized judgments in cases and controversies, nor should it be expected to do so. Such has traditionally been the function of the judicial branch. And the judicial branch should no more legislate than legislators should judge cases and controversies.

The court recognizes that

> [t]he actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even single Articles torn from context. While the Constitution diffuses power ..., it also contemplates that practice will integrate the dispersed powers into a workable government.

*Youngstown Sheet & Tube Co.*, 343 U.S. at 635, 72 S.Ct. at 870 (Jackson, J., concurring). As Justice Holmes stated, "Some play must be allowed for the joints of the machine...." *Missouri, Kan. & Tenn. Ry. Co. v. May*, 194 U.S. 267, 270, 24 S.Ct. 638, 638, 48 L.Ed. 971 (1904).

At the same time, "[t]he hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted." *INS v. Chadha*, 462 U.S. at 961, 103 S.Ct. at 2789. As nearly as possible, each branch of government must "confine itself to its assigned responsibility." *Id.*

## III.

With these principles in mind,[6] we turn our attention to the Sentencing Reform Act.

Criminal sentencing has never been entrusted to a single branch of government, by the text of the Constitution, its structure or its history. The power of Congress to define federal crimes and prescribe the punishment for them has long been recognized. *See United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95, 5 L.Ed. 37 (1820). However, for nearly as long Congress has usually established a broad range of sentences for most offenses and left it to the sentencing court—the authority with first-hand knowledge of the specific case—to decide and impose the actual sentence. *See United States v. Williams*, 691 F.Supp. 36 (M.D.Tenn.1988) (en banc). More recently, Congress delegated to the United States Parole Board, an arm of the executive branch, the power to set a prisoner's release date. *See generally United States v. Grayson*, 438 U.S. 41, 45–48, 98 S.Ct. 2610, 2613–2614, 57 L.Ed.2d 582 (1978). Thus, the actual time a defendant served was the product of decisions by all three branches—the legislative, judicial and executive.

■ Although Congress may have delegated some of its powers to other branches in the past, the basic power to define crimes and prescribe the punishment for them has always rested with the legislative branch. Courts may impose sentences

---

**5.** Consistent with article III the judiciary may also exercise certain administrative powers incidental to the smooth running of the courts, such as promulgating rules of court procedure, assigning judges to hear cases in other districts or circuits and disciplining judges.

**6.** These "principles" may do no more than corroborate Justice Jackson's observation that "[a] century and a half of partisan debate and scholarly speculation [on the separation of powers] yields no net result but only supplies more or less apt quotations from respected sources on each side of any question" that "largely cancel each other." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634–35, 72 S.Ct. 863, 869–70, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).

within the ranges Congress prescribes, but it is for Congress—not the courts—to define the ranges. The court concludes that the Sentencing Reform Act violates the separation of powers requirement of the Constitution by impermissibly assigning this legislative power to an arm of the judicial branch.

The Sentencing Reform Act designates the Sentencing Commission as "an independent commission in the judicial branch." Under article III, the judicial branch is only authorized to exercise the "judicial Power," namely, to decide "Cases" and "Controversies." It may not make substantive rules or policy decisions outside the context of specific cases and controversies. The Sentencing Commission, a commission in the judicial branch, performs just such a task:[7]

> [T]he process engaged in by the Commission in formulating the guidelines does not remotely resemble the judicial function of "interpreting and applying laws in cases properly brought before the courts" and "determining actual controversies between adverse litigants." The extensive hearings, elaborate fact-finding processes, and myriad policy decisions undertaken by the Commission in promulgating general rules of future applicability, are clear evidence that the Commission has performed the legislative function of prescribing the punishment for crime.

*United States v. Estrada,* 680 F.Supp. 1312, 1324 (D.Minn.1988) (Heaney, Circuit Judge, sitting by designation) (citations omitted). We conclude that the work of the commission is properly characterized as legislative, not judicial.

The Sentencing Commission argues that, although it does not exercise the core judi-

cial function of deciding cases and controversies, its task "is in aid of a central judicial function," namely imposing sentences in criminal cases, and hence within the judicial power. *See* Brief of the United States Sentencing Commission as *Amicus Curiae* in Support of the Sentencing Guidelines at 3; *see also id.* at 4, 5–6, 43. However, the "central judicial function" in sentencing is to impose a sentence within the boundaries established by Congress. It is the job of Congress to set the boundaries. The guidelines set boundaries by limiting the range of permissible sentences and hence the judge's discretion. They in effect set minimum mandatory sentences, *United States v. Alves,* 688 F.Supp. 70, 80 (D.Mass.1988), which is the role of the legislature, not the judiciary. *See United States v. Bolding,* 683 F.Supp. 1003, 1004 (D.Md.1988) (en banc). The judicial function in sentencing is to exercise discretion—to exercise judgment in a concrete fact situation. Limiting sentencing discretion, as the guidelines do, is a legislative function. Hence, the guidelines are in aid of the legislature's role, not the judiciary's.

■ Historically, the judicial function has been to individualize sentences (with due regard for community standards and for all the relevant facts and circumstances concerning the defendant and the crime). Although the sentencing guidelines purport to take into consideration all relevant factors, including so-called offender and offense characteristics, the effort is to standardize sentences—not individualize them. The standardization of sentences involves important policy considerations that cannot be made prospectively by unelected judges. Under the Constitution, Congress has "pri-

7. Given the Supreme Court's decision in *Miller v. Florida,* — U.S. —, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987), we believe that the sentencing guidelines promulgated by the commission are clearly substantive in nature. The issue in *Miller* was whether a revision in Florida's sentencing guidelines could constitutionally be applied to a prisoner whose crimes occurred before its effective date. In holding that such an application violated the ex post facto clause, the Court concluded that the change in the guidelines was substantive, not merely procedural. The change altered a substantial right of the petitioner since it increased the quantum of punishment attached to the crime and "create[d] a high hurdle that must be cleared before discretion can be exercised." 107 S.Ct. at 2453. Like the Florida guidelines, the guidelines promulgated by the Sentencing Commission are mandatory. *See* 18 U.S.C. § 3553(b). We believe that, because the guidelines generally increase the quantum of punishment a defendant in this district could expect to receive and severely limit the sentencing judge's discretion, they too are substantive in nature.

mary responsibility for the formulation of policy." *United States v. Williams,* 691 F.Supp. 36 (M.D.Tenn.1988) (en banc). The decisions that the commission is required to make—decisions about "the comparative societal egregiousness of one crime as opposed to another," *id.,* with their far-reaching effects on personal liberties—are the very kinds of decisions that must be made by the people's elected representatives, not by "an independent commission in the judicial branch." [8] If the members of Congress are to limit the range of permissible sentences, "as the elected representatives of the people, [they must] themselves accept[ ] responsibility for the deprivation of liberty which their action entails." *United States v. Bolding,* 683 F.Supp. at 1004.

Because the powers of the Sentencing Commission are legislative in nature and in aid of the legislature's duty to prescribe the punishment for crimes, they are unlike those auxiliary powers that courts may properly exercise under article III. Such powers are those "reasonably ancillary to the primary, dispute-deciding function" of the courts. *Chandler v. Judicial Council of the Tenth Circuit,* 398 U.S. 74, 111, 90 S.Ct. 1648, 1667, 26 L.Ed.2d 100 (1970) (Harlan, J., concurring). If the Sentencing Commission were merely authorized to prescribe procedures for sentencing courts to follow in imposing sentences, its powers might come within the ancillary powers of the courts. However, the commission does more than prescribe sentencing procedures. It in effect prescribes sentences and thus

exercises legislative power. The commission does not simply assist judges in the performance of a judicial function; it defines the sentence to be imposed on individual defendants, with all its attendant consequences. It regulates individuals—not only the individual sentenced but also others, who feel the deterrent effects of the guidelines. Such regulation is a legislative function.

In sum, the court concludes that the Sentencing Reform Act violates the separation of powers doctrine by assigning uniquely legislative powers to an arm of the judicial branch.[9] *Accord United States v. Tolbert,* 682 F.Supp. 1517 (D.Kan.1988); *United States v. Estrada,* 680 F.Supp. 1312 (D.Minn.1988) (Heaney, Circuit Judge, sitting by designation); *United States v. Thomas,* 699 F.Supp. 147, 149 (W.D.Tenn. 1988). It has been fundamental since 1803 that Congress cannot constitutionally give the judiciary more power than the Constitution provides. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

### IV.

The plaintiff concedes that the act as written is unconstitutional but argues that the court should ignore the designation Congress supplied and pretend that the commission is part of the executive branch since it ostensibly performs an executive function—implementing and enforcing legislation through administrative rule-making.[10]

8. If the actions of the commission are considered judicial, then the statute creates the unusual problem of some article III judges—some appellate, some district judges—telling other article III judges, of equal dignity and status under the Constitution, how to sentence in a specific case about which the commissioner judges know nothing. That kind of "policy" (foolishness compounded, in the opinion of some) must be within the unique province of the legislature, the body ultimately answerable to the American people.

9. Were we to agree with the Sentencing Commission that it was properly placed in the judicial branch because it performs a judicial or quasi-judicial function, we might still conclude that it violated separation of powers principles

by allowing the non-article III judges on the commission to exercise that power. *See United States v. Bolding,* 683 F.Supp. 1003, 1005 n. 3 (D.Md.1988) (en banc); *see also Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 58–60, 102 S.Ct. 2858, 2864–2866, 73 L.Ed.2d 598 (1982) (plurality opinion) (the judicial power may not be exercised by non-article III judges). However, because we disagree with the commission's position with respect to the nature of its powers, we do not reach that question.

10. The Sentencing Commission argues that there is no separation of powers problem as long as one branch is not trying to aggrandize itself at the expense of another. The conflicting positions of the Sentencing Commission (with

For the reasons discussed in part III, *supra,* we believe that the commission's function is legislative—not executive—in nature. But even were we to accept the plaintiff's characterization of the commission's powers, we believe that effecting a de facto transfer of the commission from the judicial to the executive branch, as the government (or, more precisely, the Justice Department) would have us do, would not save the statute.

 Because the guidelines set very narrow ranges for sentences and make deviation from those ranges possible in only the rarest of cases, the commission in effect determines what a convicted defendant's sentence will be. As a practical matter, the commission—not the court—imposes the sentence. Perhaps the most serious breach of the separation of powers doctrine—and due process as well—would occur if we were to accept the plaintiff's invitation, ignore Congress's designation and place the power to prescribe sentences in the hands of the executive. The plaintiff's interpretation of the statute would re-unite by statute powers separated by the Constitution and consolidate far too much power in one branch. Such a result could hardly be in harmony with the Framers' original intent. The executive would not only decide who to charge and with what crimes, but also what the defendant's punishment would be if convicted.[11] The executive would in effect be legislature, prosecutor and judge all in one. Such a consolidation of power would destroy the checks on governmental power that the separation of powers doctrine was meant to protect. As Judge Matsch has explained, "The philosophical predicate for the separation of powers doctrine is the tyrannical tendency inherent in the combination of government powers. That danger is enhanced when the combination is the powers of prosecution and punishment." *United States v.*

*Elliott,* 684 F.Supp. 1535, 1540 (D.Colo. 1988).

We therefore decline to strike Congress's designation of the commission as an arm of the judicial branch.

## V.

 Taking the commission out of the judicial branch will not remedy the act's separation of powers problems for another reason. The plaintiff suggests that, if the commission is considered part of another branch, article III judges may constitutionally serve on the commission voluntarily, in their individual capacities. The short answer to that argument is that even if voluntary service on a legislative commission is not constitutionally proscribed, the service in this case is not merely voluntary, nor do the commissioner-judges serve in their individual capacities. The Sentencing Reform Act *mandates* service by at least three article III judges. They serve not in their individual capacities but because they are judges. Such mandatory service by article III judges on the Sentencing Commission, we believe, impairs the independence and impartiality of the judiciary and hence violates the separation of powers doctrine. *Accord United States v. Tolbert,* 682 F.Supp. at 1527; *United States v. Estrada,* 680 F.Supp. at 1329–36; *United States v. Arnold,* 678 F.Supp. 1463, 1470–72 (S.D.Cal.1988); *United States v. Smith,* 686 F.Supp. 847 (D.Colo.1988); *United States v. Thomas,* 699 F.Supp. 147, 150 (W.D.Tenn.1988).

The composition of the Sentencing Commission impermissibly places article III judges in a formal, working relationship with other branches, from which they should be insulated. Such intimate involvement with other branches "undermines the

its three judicial officers, including its chairman) and the Department of Justice on the proper designation of the commission suggest that both the judicial and the executive branches may be trying to aggrandize themselves by arrogating to themselves legislative power, albeit power the legislature seems only too willing to part with.

11. Under the new guidelines, with their virtually fixed sentences, the executive's charging power already allows the executive to effectively determine a defendant's sentence by deciding what charges to bring.

status of the judiciary as a neutral forum for the resolution of disputes between citizens and their government." *In re Sealed Case,* 838 F.2d 476, 516 (D.C.Cir.), *rev'd sub nom. Morrison v. Olson,* — U.S. ——, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). Service by article III judges on the commission gives them a vested interest in the commission's work product.[12] Moreover, the judges' participation in formulating the guidelines and in training other judges in their use may stamp the guidelines "with the hallmark of members of the federal judiciary long before [they are] the subject of consideration by any court of law." *United States v. Smith,* 686 F.Supp. 847 (D.Colo.1988) (1988 Westlaw 25223). Indeed, "by participating in the formulation of the guidelines, the judges may well have supplied a legitimacy to what may have otherwise been a politically unpalatable proposition, both to the public and to other members of the judiciary." *Estrada,* 680 F.Supp. at 1335 n. 30. Acceptable ranges for criminal sentences is a highly charged, politically sensitive decision that is best left to the legislative branch. By shirking its responsibility to set sentencing ranges and requiring judges to make such prospective policy decisions for other judges, Congress impairs the independence and impartiality of the judiciary.

■ Equally important, the statute gives the executive unwarranted control over the judiciary, further impairing its independence and impartiality. It allows the President to remove members of the commission "for neglect of duty or malfeasance in office or for other good cause shown." Unless the commission is deemed part of the executive branch, which we believe it should not be for the reasons discussed in part IV, *supra,* we believe that the removal power alone is sufficient to invalidate the statute. *Cf. Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed. 2d 583 (1986) (striking down the reporting provisions of the Gramm–Rudman–Hollings Act on the grounds that it gave executive power to an officer subject to removal by Congress for, among other reasons, "neglect of duty" and "malfeasance").

■ Nearly as important as the presidential removal power is the appointment power. Appointment to full-time service on the Sentencing Commission (or any other commission Congress might choose to create and staff with judges) could be an easy way to effectively remove a troublesome judge. Or an appointment to such a prestigious position could be held out as an incentive for one to conform more closely to accepted views. In short, "[s]ervice on the Sentencing Commission subjects the judicial participants *both* to the carrot of advancement and to the stick of removal." *Estrada,* 680 F.Supp. at 1332.[13]

The Sentencing Commission suggests that difficult social problems require novel solutions and that the country should not be deprived of judges' expertise in deciding questions of sentencing policy.[14] Nothing

---

**12.** The vested nature of that interest is apparent in this case, where the commission has appeared as an advocate (in the form of amicus curiae), arguing in support of the constitutionality of its own work product.

**13.** The carrot may be especially attractive to district court judges since the act provides that commissioners "shall be compensated at the annual rate at which judges of the United States courts of appeals are compensated." 28 U.S.C. § 992(c). We take judicial notice of the fact that judges of the courts of appeals are compensated at a higher rate than judges of the district courts.

**14.** The Sentencing Commission in essence takes the position one commentator has labeled the "evolutionary tradition" in separation of powers jurisprudence. That tradition "emphasizes the need to adapt the powers of the federal government to the perceived demands of a changing society." It is characterized "by a deference to the congressional judgment on the most effective means for deploying its authority." Carter, *From* Sick Chicken *to* Synar: *The Evolution and Subsequent De-Evolution of the Separation of Powers,* 1987 B.Y.U.L.Rev. 719, 719. Opposed to the evolutionary tradition is the "de-evolutionary tradition," which "actively seeks return to a system of balanced and separated powers modeled closely on the governmental design that the Framers had in mind when they established a constitutional government." *Id.* at 720. Professor Carter has explained the differences between the two ways of thinking as follows: "[T]o the de-evolutionary judge, the crucial concern in adjudication under the separation of powers is legitimacy and the need for constitu-

in this court's decision, however, prevents Congress from seeking judges' input in formulating sentencing ranges through normal legislative procedures for gathering facts and eliciting public input.

In short, we believe that characterizing the commission as part of another branch won't save the statute. The Sentencing Reform Act violates the separation of powers doctrine both by placing the commission in the judicial branch and by requiring article III judges to exercise nonjudicial powers, subject to removal by the President, regardless of where the commission is placed.

### VI.

■■■ Our conclusion that the Sentencing Commission exercises legislative powers raises additional constitutional concerns. There are certain legislative powers that Congress cannot constitutionally delegate. *See, e.g., A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 529, 55 S.Ct. 837, 842, 79 L.Ed. 1570 (1935). Among those powers, we believe, is the power to define and fix the penalties for crimes and to limit the sentencing discretion of federal judges. We therefore conclude that the Sentencing Reform Act constitutes an unlawful delegation of legislative authority. *Accord United States v. Williams,* 691 F.Supp. 36 (M.D.Tenn.1988) (en banc); *United States v. Brittman,* 687 F.Supp. 1329 (E.D.Ark.1988).[15]

■■■ Moreover, as we have concluded in part III, *supra,* the actions of the Sentencing Commission are, in "character and ef-

fect," an exercise of legislative power. *See INS v. Chadha,* 462 U.S. 919, 952, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983) (quoting S.Rep. No. 1335, 54th Cong., 2d Sess., 8 (1897)). Article I of the Constitution "represents the Framers' decision that the legislative power of the Federal Government be exercised in accord with a single, finely wrought and exhaustively considered, procedure." *Id.* at 951, 103 S.Ct. at 2784. Under article I, section 7, before a piece of legislation can become law it must "have passed the House of Representatives and the Senate" and "be presented to the President of the United States" for signature. Thus, we further conclude that the guidelines promulgated by the Sentencing Commission are unconstitutional because they have not been passed by both Houses of Congress and presented to the President. *See also United States v. Johnson,* 682 F.Supp. 1033, 1035–38 (W.D.Mo.1988) (Wright, C.J., dissenting), *cert. granted sub nom. United States v. Mistretta,* —— U.S. ——, 108 S.Ct. 2818, 100 L.Ed.2d 920 (1988); *United States v. Brittman,* 687 F.Supp. 1329 (E.D.Ark.1988). Congress cannot delegate its power to enact legislation in contravention of the majority passage and presentment requirements of the Constitution.

### VII.

Having concluded that the Sentencing Reform Act of 1984 violates the separation of powers doctrine, the nondelegation doctrine and the procedural requirements of article I, we do not reach the other arguments that the defendants and amicus National Association of Criminal Defense Lawyers have raised.[16] However, because

---

tional authority. The evolutionary judge is more concerned with the efficiency—perhaps a better term is effectiveness—of government operation." *Id.* To the extent we conclude that the efficiencies of the Sentencing Reform Act do not make up for its lack of constitutional authority, we run the risk of being labeled "de-evolutionary." However, as Professor Carter concludes, that may not be all bad. By requiring determinacy and continuity of the governmental structure, the de-evolutionary position helps ensure that, however humane it may be, "the government does not become an outlaw." *Id.* at 813.

15. Even if Congress could constitutionally delegate the powers it has given the Sentencing Commission, we would still have serious questions about the adequacy of a delegation that delineates not a single, general policy but four, at times conflicting policies. *See supra* note 3.

16. Those arguments include the following: the act violates due process by precluding the sentencing authority from fully weighing all of the *relevant facts in determining an appropriate,* individualized sentence; the guidelines promulgated pursuant to the act violate due process by imposing punishment based on criminal culpa-

it is possible that Congress may be able to reinstate the sentencing guidelines in a constitutional manner, we add the following observation on the Sentencing Reform Act and the guidelines.

The perceived evil the act was meant to correct—disparity in sentencing—may be more myth than reality. The alleged disparity may simply reflect the courts' desire to recognize the differences among defendants and offenses rather than emphasizing the similarities. The violation of the same statute, in different ways and in different places for different motives by different individuals with different ages, backgrounds, education, personalities, mental abilities, family relationships and different potential for rehabilitation may not be the same crime. Although the guidelines purport to take into consideration many of these factors, it is impossible to foresee every possible situation. For example, it is doubtful whether Congress or the commission could have foreseen the unique personalities and facts involved in this case. To the extent that the guidelines treat the poor, deeply religious grandmother from Marion, Utah, who has young children at home to support, the same as the successful, hardened mafioso from the Bronx, we believe the guidelines err.[17] More importantly, even if the commission could foresee every relevant factor, it is impossible to say how those factors should be weighed in any given case to come up with the most appropriate sentence, given all of the goals of the criminal justice system. Thus, we question the wisdom of any guidelines system that requires the mechanical application of a limited number of factors. Such a system, if enacted by Congress in accordance with article I and not by an arm of the judicial branch, may be constitutional, but it may not make sense as a matter of policy.

## VIII.

Because the Sentencing Reform Act's creation of and delegation of power to the Sentencing Commission is unconstitutional, the guidelines that the Sentencing Commission has promulgated pursuant to the act are invalid as the product of a constitutionally infirm commission. We will therefore not apply the guidelines in pending cases.

We decline to sever the unconstitutional provisions of the Sentencing Reform Act from the remainder of the act. We agree with Judge Shoob of the Northern District of Georgia that "severance of the guidelines and the portion of the Act that creates the Commission effects such a radical change in the legislation that it becomes an entirely new bill." *United States v. Russell*, 685 F.Supp. 1245 (N.D.Ga.1988). We will therefore "leave the task of rewriting the Act to Congress." *Id.*

Until such time as the Court of Appeals or the Supreme Court directs otherwise, all criminal defendants in this district will henceforth be sentenced as if their criminal conduct occurred prior to November 1, 1987, the effective date of the guidelines. We recognize that our view of the act's constitutionality may not ultimately prevail. We therefore direct the United States Probation Office for this district to process its presentence investigation reports under both the old and the new systems in case a defendant may have to be resentenced at a later date.

---

bility that may be established without the full panoply of constitutional protections; the guidelines are invalid because they are inconsistent with the Sentencing Reform Act; and the guidelines cannot take effect because the statutory conditions for their taking effect have not been met.

17. The commission is not supposed to take into consideration "the race, sex, national origin, creed and socioeconomic status of offenders." 28 U.S.C. § 994(d). The commission may consider "the community view of the gravity of the offense," *id.* § 994(c)(4). Community standards by definition vary with the community and thus depend on geographical factors, yet the guidelines do not take into consideration where the offense occurred or where the defendant resides.